## The Trustees of the METHODIST EPISCOPAL CHURCH and others *against* JOHN D. JAQUES and others.

October 1, 2, 3, and 4, and November 12.

Where the husband is permitted, by the wife, to have the management of her separate property, secured to her by a marriage settlement, to receive rents, &c. very strict proof of his having paid to, and settled with her, during her life time, for the sums received, is not required; but, from the confidential nature of the connexion, the most favourable presumptions are indulged towards him. He cannot, however, claim money received by him for a judgment debt due to the wife, on the ground of the mere *parol declarations* of the wife, contrary to the terms of settlement.

A *feme covert*, with respect to her separate propety, is to be considered as a feme sole, to the extent only of the power given to her by the marriage settlement. Her power of disposition is not absolute, but *sub modo*, to be exercised according to the mode prescribed in the deed or will under which she becomes entitled to the property. Therefore,

If she has a power of appointment, by *will*, she cannot appoint by *deed;* or when she is empowered to appoint by *deed*, the giving a bond, or note, or parol promise, without reference to the property, or making a parol gift of it, is not such an appointment.

So, when it is said in the settlement, that she is to receive from the *trustee* the income of her property, as it may, from time to time, become due, she has no power, *by anticipation*, to dispose, at once, of all that income.

**1817.**

**Metho. Epis.
Church
v.
Jaques.**

No *exception* can be taken to a report of a master, unless the objection was made to him previous to his signing his report.

A party, in an account before a master, under the head of *general expenses*, is not to be allowed any thing, without specifying particulars.

Where one party produces a paper to charge the other, the opposite party may use it in his discharge; but it does not follow that each part is entitled to the same credit.

Where the discharges are inaccurate in some instances, and are destitute of precision and certainty, as to place and circumstance, the whole may be rejected.

*Costs* on exceptions to a master's report are allowed to each party, on the exceptions in which they have each, respectively, prevailed.

The mistake of the master is not like the error of a judge, and is no rule as to costs.

THIS cause was brought to a hearing, on the pleadings and proofs, in *June*, 1815, (*Vide* S. C., vol. 1. p. 5. and p. 450.) The decree of the court, the 27th of *June*, 1815, settled the principles on which an account was to be taken between the parties, and an order of reference was, thereupon, made to a master, to take and state the account according to the directions there given. It being subsequently discovered that some of the property advertised for sale, under the decree, had been mortgaged, further directions were given to the master, by an order dated the 5th of *October*, 1815. In pursuance of these orders, the master proceeded in taking the accounts, and continued until *March*, 1816, when he died without having completed them. On the 29th of *April*, an order was made transferring the reference to another master, who made his report the 10th of *April*, 1817. The plaintiffs took exceptions to this report. On motion of the defendant's counsel, the master was ordered, on the 8th of *September*, 1817, to deliver certified copies of the minutes of *testimony* taken, and of the *vouchers* produced before him. (S. C. vol. 2. p. 543.

*Oct.* 1, 2, 3, 4. The cause was brought to a hearing in *October* last, on the exceptions to the master's report, being *eighteen* in number.

*Harison* and *Riggs*, for the plaintiffs.

*T. A. Emmet*, for the defendant.

It is not thought necessary, or useful, to state the report and evidence at large, nor to note the decision of the court on those exceptions which related merely to matters of facts. The material facts, as well as the nature of the other exceptions, and the points decided, will sufficiently appear from the following opinion delivered by the court.

*Second exception.* That the master charged the defendant with the rent of the premises adjoining *Broadway* and *Crosby* street, from the 1st of *November*, 1810, to the 1st of *May*, 1812, being 615 dollars, with interest, without allowing the defendant to be discharged therefrom, as being received by him for and on account of his wife, and paid or otherwise accounted for, and settled with her in her life time.

THE CHANCELLOR. The defendant admitted, before the master, that he had received the rent in question, and had given his receipts for it; and it was proved by *Usher* and his wife, that the defendant had applied for the rents from the tenant, and signed the receipts. The objection to the allowance is, that he had paid the money over to his wife. The proof in support of that allegation, was derived from the testiomony of *Margaret Stewart*, who says, that she lived with Mrs. *Jaques*, when *Usher* hired the house, and that sometimes she received the rent from *Usher*, and sometimes the defendant received it *and paid it over* to her, and that she was present, several times, when Mrs. *Jaques* received the rent, and also, when the defendant paid it over to her. She heard Mrs. *Jaques* ask the defendant if he had gotten the rent from *Usher*, that she wished him to give it to her.

Where the husband is permitted by the wife to have the management of her separate estate, to receive rents, &c., very strict proof of his having paid to, and settled with her, in his life time, for the sums received, is not required; but from the confidential nature of the connexion, the most favourable presumptions are indulged towards him.

It is said that the most entire reliance is not to be placed on the accuracy of Miss *Stewart's* testimony, as her narrations were a little variable and inconsistent, and her memory not the most regular. But in a case of this kind, it

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

does not require the strongest proof to protect the husband; and it ought to be observed, that the character of this witness stands unimpeached, and that she was the confidential friend of Mrs. *Jaques.* The rent in question was part of the proceeds or income of the wife's estate, and the presumption is, that the wife was satisfied, and that her husband had duly accounted to her for the rent. Unless we reject Miss *Stewart's* testimony entirely, we must draw this conclusion. I admit, that as between strangers, a more strict and severe proof would be required, but the books teach us that the greatest liberality is shown, and the most favourable presumptions indulged, when the husband is permitted by the wife to be concerned in the management of the income of her separate estate, as it occasionally accrues.

Exception allowed.

*Third exception.* That the master has charged the defendant with all sums of money which appeared to have been possessed or claimed by the wife during her marriage, and which came into his hands, without consideration or regard, whether such sums were comprehended in the deed of marriage settlement, or produced by the sale, change or transfer of some part of the settled property, instead of taking an account of all her personal estate at the marriage, and secured to her by the settlement, and permitting the defendant to discharge himself by accounting therefor.

THE CHANCELLOR. This exception is generally to the mode of accounting before the master, and it is a sufficient answer to it, that it was not taken before the master. The mode adopted was acquiesced in. It would be oppressive, and render cases of reference a grievous burden, if a party might be permitted to lie by with an objection of that kind, until the accounts had been taken, after a tedious

and expensive investigation. In this very case, it was stated at the bar, that there had been upwards of *fifty-seven* distinct hearings before the master. Few suitors would be willing to endure the repetition of such a reference, and they ought not to be compelled to submit to it, unless the necessity and justice of it be very apparent. The rule of practice is founded in much good sense, that no exceptions are to be taken to a report which were not made before the master had signed the report, for the master might have allowed the objections, and have saved the parties unnecessary expense, as well as the court unnecessary trouble. (2 *Harrison's Prac.* 146. *Wyatt's P. R.* 380, 381.) This rule is not departed from, except in special cases, such as that of *Pennington* v. *Muncaster*, (1 *Maddock's Ch. Rep.* 555.) in which the general rule was emphatically admitted.

The defendant in his discharges, exhibited to the master, stated that he claimed to be discharged from all moneys not comprehended in the marriage settlement, or not produced by the sale, change, or transfer of some part of the property included therein. If he has been charged with any property not so included or so produced, it is for him to show it, and not to object, in general, to the mode of accounting. I believe it is not pretended, that he is to be responsible beyond the estate which his wife owned at the date of the marriage settlement, and the income or produce, or results of it. The claim set out in the beginning of the defendant's discharges, was not a distinct objection to any particular mode of accounting, provided that claim was tolerated.

Exception disallowed.

*Fourth exception.* That the master has charged the defendant with 1,208 dollars 26 cents, as received by him for the leasehold estate in *Warren* street, sold under *Heyle's* mortgage, and purchased by *Wilmerding*, though

---

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

---

No exceptions can be taken to a report of a master, unless the objections were made to him previous to his signing the report.

that was the money of the defendant himself, and grew out of his own proper funds.

THE CHANCELLOR. The defendant admitted in his answer, that he received this money and never paid it to his wife, and he admits that it arose out of part of the property mortgaged by *Heyle* to his wife.

To understand the nature of this exception we must look into the whole complicated operation of the defendant under the mortgage and the judgment which Mrs. *Jaques* had upon the property of *Christian M. Heyle.*

The defendant admits in his answer, that his wife held a mortgage of *Heyle* to 3,430 dollars, on two lots in *Warren* street, and one lot in *Murray* street, and that she had also a judgment bond against him to 2,772 dollars, 75 cents. One of the lots in *Warren* street, was a freehold estate, and the other lot in *Warren* street, and the lot in *Murray* street, were leasehold estates. He admits, also, that in the summer of 1806, his wife was sued on a note which her former husband, *Wm. Alexander,* had given to *Heyle,* and which had been assigned to *Robert Murray,* as a security for the payment by *Heyle* for the leasehold estate in *Murray* street; that he paid that note to 493 dollars, 15 cents out of his own proper moneys, and took an assignment of that lease as his security for the repayment. This was a very suspicious transaction on the part of the defendant. He admits that his wife's personal estate, in that very summer, was 1,466 dollars, 16 cents. This was independent of all her real estate; yet he paid off a note against her with his own proper moneys, and took an assignment of a lease as a security for his reimbursement. It appears to me that the fact of his discharging the note with his own moneys is incredible, and still more so that he should require security for the repayment. But he goes on and states in his answer, that while engaged in settling that business, he discovered that *Trinity Church* held a

mortgage, for 112 pound 12 shillings, from *Heyle*, for one of the *Warren* street lots, and which was prior to his wife's mortgage. He then, without disclosing the discovery to his wife, buys in that mortgage, *also out of his own proper moneys*, and takes an assignment of it to himself. He discovered further, that one *Wagner* had a mortgage on the other lot in *Warren* street, and that mortgage he also pays off with his own proper moneys, and takes an assignment of it to himself. He says further, that to secure himself, and to obtain possession of the rents, he mentioned these mortgages to his wife, and she then placed in his hands the securities, by mortgage and judgment, which she held against *Heyle*, " desiring him to do the best he could," and apply the proceeds, both principal and interest, to family expenses, and to repairs on her property. Such is the defendant's narration of this transaction, and if he had (as he says he had) the entire confidence of his wife, and all the influence resulting from that confidence, and if he assumed and exercised (as he avers he did) a considerable agency in the management of her property and money transactions, then certainly such trafficking for his own benefit, under the mask and in the performance of his trust, as agent, was altogether unwarrantable.

Having thus attached the prior liens in himself, and acquired the unlimited discretion over his wife's subsequent debts and incumbrances, he proceeded to consummate his speculation. By agreement with *Heyle*, he gets into possession of the rents of all the lots, and comes to an account and settlement with *Heyle*, by which it would appear that *Heyle* owed him, upon all his combined demands, 8,026 dollars 97 cents. He next commenced two suits in equity to foreclose the mortgages, and by an amicable reference, under an agreement with *Heyle*, 7,218 dollars 26 cents was reported due by the master ; and all of it was due to him, he says, because " he had advanced as much as the wife's mortgage and judgment for family expenses." A

sale took place under the decree, and the leasehold property in *Warren* street was purchased by *Wm. Wilmer-ding*, and the money paid into court, and afterwads received by the defendant, and this is the money now in question under this fourth exception.

But to proceed with the story ; the other freehold property in *Warren* street, and the leasehold property in *Murray* street, were both purchased by the defendant; the one for 1,520 dollars, and the other for 4,500 dollars, and the purchase moneys, in both cases, set off in part of the claim of the defendant against *Heyle*. The leasehold property in *Murray* street the defendant, afterwards, sold to his brother *Robert Jaques*, one of the defendants, for 2000 dollars, and who admits that he knew, when he purchased, of the manner in which the defendant had acquired his right and title.

The defendant says, that he reported to his wife what he had done, and she was satisfied and acquiesced. He says, also, that he never paid or accounted to her for the moneys arising upon the sale, otherwise than by applying what *Heyle* owed her as she directed.

How far Mrs. *Jaques* was satisfied, may be inferred from what she declared to *Alexander Clark*, in the autumn subsequent to these sales, when she said that she felt uneasy respecting her husband's conduct relative to her estate and property, and that he and his brothers were doing things which she thought injurious to her interest. She certainly thought that the defendant was acting *for her*, and not *for himself*, in the business of these mortgages, for she told *Heyle* that she and the defendant had been selling some of her property, in order to buy up the prior mortgages.

By the decree of the 27th of *June*, 1815, I considered those purchases as made by the defendant, as trustee for his wife, with her moneys, and that the land equitably belonged to her. If the land was hers, the moneys resulting from the sale of those lands equally belonged to her. It was

equally trust money. The exception is in the face of that decree, and unless that decree was erroneous, the exception must fail. The money paid by *Wilmerding* did not grow out of defendant's own proper funds. There is decisive proof of this from the admissions of the defendant in his answer.

He gives, at the end of his answer, what he terms a just and true account of all the money and property received by him from the 1st of *August*, 1806, out of property belonging to his wife, and one *item* of the moneys so received is the balance due her from *Heyle*, amounting to 8,026 dollars 97 cents. This is the precise sum which, in another part of his answer, he says, was due on a settlement with *Heyle*, after he had purchased in, *with his own proper moneys*, the outstanding incumbrances, and taken in hand those of his wife. In one part of his answer, he admits the whole of that sum to be his wife's property, and in another part, that a considerable part was of his own proper moneys. Such inconsistency and contradiction shake the credit of the defendant's allegations in his own favour, and it seems to me impossible to doubt, that the moneys arising from the sale of the mortgaged premises belonged exclusively to his wife.

The conclusion is, that this money paid by *Wilmerding* belonged to the wife, and the pretext of the defendant, that it was agreed between him and his wife, according to his first answer, that he should receive *Heyle's* money, *towards reimbursement of the sums expended by him on her account*, or, according to the second answer, that he was to apply it to *family expenses, and to repairs*, is altogether inadmissible. There are witnesses who testify to similar declarations of the wife, and the claim of the defendant to the part of *Heyle's* mortgage money contained in this exception, as being his own proper moneys, is probably founded on some such alleged parol gift or agreement with the wife. In this view, the exception is also repugnant to the decree

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

of the 27th of *June*, 1815, by which no allowance was to be made, except in special cases, out of the *principal* or capital of the wife's personal estate, for family expenses, on the foot of any general agreement.

The question as to the power of a *feme covert* over her separate property, settled to her separate use, and the manner of its execution, examined.

As several of the exceptions look to this point, it may be expected that I should give the subject a more extended consideration. The counsel, while upon these exceptions, cited several cases, in respect to the wife's power of disposition over her separate property, and the requisite evidence of it. The counsel for the defendant referred to 2 *P. Wms.* 82. and 4 *Viner*, 130. and the counsel for the plaintiffs to 10 *Vesey*, 586. 2 *Vesey*, jun. 498. and 1 *Maddock's Treatise*, 377. 380. At the first glance at the authorities, they appear to be full of contradiction and confusion.

It is to be observed, that by the decree under which the account was taken, the defendant was only to account for the principal, and not for the interest or dividends on his wife's personal estate, received by him during the coverture. The agreement with the wife as set up by the defendant, was, that the family expenses were to be borne out of the *income* of her estate, and I am not aware that the defendant is, in fact, charged with any part of that income. He was even to be allowed for an appropriation of principal, when founded on special directions in the given case, and apparently for her benefit. Any greater latitude would deprive a wife of the protection which the marriage settlement, and the creation of a trustee threw around her, and which protection the law allowed her to assume. It would be exposing the wife to the acts, machinations, and undue influence which the general dominion and power of the husband must greatly facilitate. The question here is, whether the defendant is authorized to set up a title to the large debt of his wife against *Heyle*, founded on parol declarations of the wife.

The settlement in this case was made with all due form

and solemnity, and the husband became a party to the deed. It was made immediately previous to the marriage, and the defendant voluntarily acceded to the marriage contract, upon the express conditions contained in the settlement, and he was bound in good faith to the observance of them. The deed recited that "he had agreed not to intermeddle with, or have any right, title or interest, either at law or in equity, to any part of the rents, issues, profits or procceds of her property, real and personal, (and which was mentioned in general terms in the deed,) but it was to continue, remain, and be to her, or to such uses as were in the deed of settlement expressed." After this recital, the deed conveys her estate, real and personal, (and which is again, and in more particular terms mentioned,) to *Henry Cruger* in trust for her, and upon her marriage, to the use of such persons and uses, and subject to such provisions, as she, with the concurrence of her husband, should *by deed*, or by will, without his consent, give, limit, direct, and appoint. In default of such directions, &c. then to the trustees, "in trust to permit her to hold and enjoy the same, and receive and take the rents, issues and profits, and that *her receipts should alone be sufficient discharges, from time to time,* to the end that the same should not be subject to the controul, debts, intermeddlings, or engagements of her husband, but should be to her only use, benefit, and disposal."

The defendant ought to be precluded, by this deed of settlement, from claiming any part of his wife's estate, founded on any *parol* agreement or gift of the wife; and he sets up no other. The object of the settlement was to protect her against his debts, controul, or interference, and the intention is too manifest to be mistaken. A court of equity will certainly protect the wife in the enjoyment of the property, according to the settlement. Her disposition of the property was to be by *by deed*, in concurrence with her husband, or *by will*, without it; and her *receipts*

were to be, "alone," sufficient discharges, from time to time, of her title to the rents, issues, and profits. To allow the husband to set up contemporary, or subsequent parol agreements, confessions, or gifts, would be allowing him to contradict and defeat the settlement. It would be, at once, exposing the wife to all that undue influence, and that marital "intermeddling and controul" which the settlement was intended to prevent.

These marriage settlements, are made to secure to the wife, and her offspring, a certain support in every event, and to guard her against being overwhelmed by the misfortunes, or unkindness, or vices of the husband. They usually proceed from the prudence and foresight of friends, or the warm and anxious affection of parents. If fairly made, they ought to be supported, according to the true intent and spirit of the instrument by which they are created; and I am very unwilling to admit that, notwithstanding the cautious language of this settlement, the wife was to be deemed to have absolute dominion over the property, as a feme sole, *and not bound by the prescribed form of disposition.*

A court of equity will always carry the intention of these settlements into effect, when that intention is explicit and certain. The court will not suffer the grant to be defeated, or the intention of the settlement to fail. This is the general principle that pervades the cases, however discordant they may be in the application of their doctrines, or however perplexingly subtle in their distinctions. Now, if the meaning of the settlement in this case was, that the wife could only dispose of her estate, real or personal, by deed or will, or bar herself of the rents, issues, and profits, by her receipts, how can the court uphold the husband in setting up a parol disposition, or gift, and especially, *as against the very settlement to which he was a party?* If the instrument contains a prescribed form of disposition, I do not see why it is not as available as if the

deed contained a proviso against any other mode of dis-
position. It is a question of intention and construction
merely. In this case, the settlement was a condition pre-   METHO. EPIC.
cedent, and the husband married upon that condition of        CHURCH
settlement. Justice and good faith require that the wife        v.
should not lose, nor the husband acquire, that separate use    JAQUES.
of the property, unless in the mode prescribed. These
interests which married women are permitted to take for
their separate use, are creatures of equity, and equity may
modify the power of alienation according to the intention
of the settlement, which is to secure a separate and certain
provision for the wife, free from the controul of her hus-
band, and not to be parted with except, in the mode, and
under the checks prescribed. If the technical rule of law,
that when a person is owner of property, he takes it with
all its incidents, and that every restraint on alienation is
repugnant to the ownership, be applied to these settle-
ments, they may be abandoned at once, as delusive,
for the most guarded proviso against alienation would be
void. But I am not able to perceive any objection to a fair
construction of these instruments, nor to a decided sup-
port of them according to their object and intention,
without suffering ourselves to be embarrassed by such
technical rules. I wish that I felt myself more at liberty than
I do to pursue this course, for the weight of authority
seems to impede it; yet I apprehend the cases are too
unsettled and contradictory to afford any certain con-
clusion on the point. They are, certainly, in favour of the
position, that a married woman is considered in equity,
with respect to her separate property, as a *feme sole*, and
is held to have an absolute dominion or power of dispo-
sition over it, *unless her power of disposition be restrained
by the deed or will under which she became entitled to it.*
The next question then is, when does the deed restrain
her? I think she is to be deemed restrained in the present
case, to the modes of disposition mentioned, and that her

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

husband cannot set up any other less solemn alienation against her. Here, also, the weight of book authority, and especially of the writers who have treated on this branch of the law, is against this conclusion: they seem to hold, that there must be an express restriction upon alienation, either absolutely, or in some other mode than the one mentioned, or the wife will not be bound. But if the intention be equally clear and certain in the instrument in question, why should more explicit language be required? The intention evidently was, in this, as it is in most other cases of property settled to a married woman's separate use, that the interest should be unalienable, except in the mode provided. Then why should not the court give effect to that intention? There is no sufficiently uniform and unruffled current of authority to prevent it.

It may not be amiss to examine the adjudged cases, in respect to this power of disposition in the wife over her separate property settled to her separate use. There is instruction to be gathered on the march, though the path be dreary.

In *Powell* v. *Hankey & Cox*, (2 *P. Wm.* 82.) the wife, before marriage, and with the consent of her intended husband, conveyed her real estate to such uses as she, during coverture, should appoint, and she assigned her bonds and mortgages to her separate use; during coverture, and for the course of ten years, she constantly permitted her husband to receive *the interest* of her bonds and securities, without any complaint, either to the debtors, or to her trustees. In a suit by her, after her husband's death, it was held, that as to the interest so received, every reasonable intendment was to be made against the wife, and her consent to her husband's receipts of such interest was to be presumed, and he had probably received and lived upon it as a gift. But his estate was held accountable for any part of *the principal* which had been received.

This rule was followed in the decree in the cause now

before me, and the case is an authority for the allowance of the second exception, and equally so against the claim to any part of the principal of the wife's estate, as advanced under this fourth exception.

The cases of *Squire* v. *Dean*, (4 *Bro.* 326.) *Smith* v. *Camelford*, (2 *Ves.* jun. 698.) and *Brodie* v. *Barry*, (2 *Ves.* and *Beam*, 36.) equally show that the wife may authorize the husband, in any informal manner, to receive the income, profits, or dividends of an estate settled to her separate use ; and her consent that he should receive them for the purposes of the family will even be inferred from the fact of his having actually received and applied them, from time to time ; and that presumption will stand good, until destroyed by proof to the contrary. While the presumption of her assent remains, the husband's estate will not be held to account, at least for more than one year's income so received ; but there is some discordance among the cases whether an account of the income of the wife's estate can be taken against the husband, *even for one year*, when he has been permitted by the wife to receive the income, and has applied it to family purposes. The cases of *Powell* v. *Hankey*, *Squire* v. *Dean*, and *Smith* v. Lord *Camelford*, already cited, and *Dalbiac* v. *Dalbiac*, 16 *Vesey*, 126. seem to be against such an allowance ; but the cases of *Townshend* v. *Windham*, 2 *Vesey*, 7. *Peacock* v. *Monk*, Ibid. 190. and *Parkes* v. *White*, 11 *Vesey*, 225. are in favour of it.

The same rule applies upon settlements of pin-money, where the wife has permitted the arrears of pin-money to accumulate, without demand, and the husband, in the mean time, has maintained her. (*Thomas* v. *Bennet*, 2 *P. Wms.* 340. Countess of *Warwick* v. *Edwards*, 1 *Eq. Cas. Abr.* 140. pl. 7 Lord *Hardwicke*, in 2 *Vesey*, jun. 7. 190. *Fowler* v. *Fowler*, 3 *P. Wms.* 355.)

In respect to these cases of income and pin-money, the leaning of the court has been too much against the wife.

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

and the presumption of her consent too freely indulged. Lord *Macclesfield*, observed, in one of the cases, (2 *P. Wms.* 82.) that "it was against common right that the wife should have a separate property from her husband, and, therefore, all reasonable intendments were to be admitted against her." He, also, observed, that though the wife was kept in awe, and hindered from making her demand, by reason of her husband's temper, yet she might have complained to her trustees, and even if there was no other person than her husband of whom to demand her allowance, she would be concluded if she made no demand, even if she probably might be afraid to do it. In one other of the cases, (3 *P. Wms.* 355.) Lord *Talbot* says, that though the husband settles an annuity in trust for his wife's separate use, yet if he provide her with "clothes and other necessaries," it will for the time, be a bar to any demand for arrears.

Such strong aversion to the wife's independent enjoyment of her separate estate, manifested so early in the history of the cases, may have given a permanent tone and colour to the doctrines of the court ; and, perhaps, the language of these cases will not now be thought to be founded in equity and justice. The doctrine of Lord *Talbot* did away all the beneficial effect of the settlement, for if the mere supply of necessaries (which the husband was bound at all events to furnish) be a bar to the provision, the settlement becomes utterly nugatory. It is as idle as it would be *ducere sulcos in pulvere.* In *Norton* v. *Turville*, (2 *P. Wms.* 144.) the wife, before marriage, with consent of her intended husband, conveyed an estate to her separate use, and during coverture she borrowed money upon bond. Her separate estate was held liable, after her death, for this bond, though it was admitted that the bond was void, and the giving of it was certainly not within the purview of any disposition of her estate, any more than if she had become bail or bound in recognizance. The de-

cision was utterly irreconcilable with any known princi-
ple; for if she was to be deemed a *feme sole*, it could only
be as to the controul and disposition of her separate estate,
and the giving of the bond was no such act.  It is said, in
some subsequent case, that the wife had the power of ap-
pointment by deed or will; and as the separate estate is
here stated to have been "a trust estate for the payment
of debts," it is probable she made it so by will, and then
the decision stands on good ground.

  Lord *Hardwicke* was, also, disposed to carry the wife's
power of disposition over her separate estate settled
to her separate use, to a dangerous extent, and inconsistent,
as I humbly conceive, with the policy and the intention of
the provision.

  In *Ridout* v. *Lewis*, (1 *Atk.* 269.) his Lordship stated
it to be a general rule, that if the wife suffered her husband
to receive what she had a right to receive to her separate
use, and they continued to cohabit together, it implied a
consent in the wife to submit to such a method; and he
said she might come to an agreement with her husband in
relation to any thing she was entitled to separately.  This
was the case of an annuity settled by the husband upon
the wife, and here the presumption of her consent was re-
butted, and her husband's estate held to account for short
payments, for several years.

  There is nothing peculiar in this case, though Lord
*Hardwicke* did not explain the nature of the agreements the
wife might make with the husband, nor under what guards
and checks, if any, they were to be made.  The *dictum* is
too loose to be of any weight.  But in *Stanford* v. *Mar-
shall*, (2 *Atk.* 69.) a trust of real estate was created for
the benefit of daughters, and the rents and profits appro-
priated for their separate use, whether *sole* or *covert*, and
to be paid to whom they should appoint.  They became
surety in a bond with their husbands for their debts, and
the rents and profits of the trust estate were held responsi-

ble to the creditor, because the daughters had an absolute power over them, and could create any lien on them. This was decided at the Rolls, and the principle was correct, that the daughters had the power to assign the rents and profits, by mortgage or otherwise; but there is no reasoning to show that the wife could create a lien on the rents and profits, by giving *a bond for her husband's debt.* The bond was null and void, and had no reference to the separate estate. The principle had no application to the case. In another case, (*Clerk* v. *Miller,* 2 *Atk.* 379.) a married woman, having a separate estate, promised to pay her husband's workmen, and the Master of the Rolls there doubted whether her bare promise, by parol, could bind her lands. It is difficult to perceive upon what reasoning or doctrine the bond, or parol promises of a *feme covert,* could for a moment be deemed valid. She is incapable of contracting, according to the " common right" mentioned by Lord *Macclesfield ;* and if investing her with separate property gives her the capacity of a *feme sole,* it is only when she is directly *dealing with that very property.* The cases do not pretend to give her any of the rights of a *feme sole,* in any other view, or for any other purpose.

In *Allen* v. *Papworth,* (1 *Vesey,* 163. and *Belt's Supplement,* p. 88.) the wife, on a bill by her and her husband, submitted, that the profits of her separate estate should be applied to pay her husband's debts, and Lord *Hardwicke* held her bound by that submission ; and that as she had the power to receive the profits of an estate to her separate use, and to appoint them as she pleased, the bill and submission were equivalent to an actual appointment. In that case there was no mode of exercising the power prescribed, and perhaps this mode by bill, when her free consent can be ascertained, may be deemed as safe and expedient as any other mode of appointment.

In *Ellis* v. *Atkinson,* and *Clarke* v. *Pistor,* (3 *Bro.* 347. *note*) and *Chesslyn* v. *Smith,* (8 *Vesey,* 183.) the profits

of stock were settled to the separate use of the wife, and as she should designate in writing; and her consent, signified by a bill filed jointly by her and her husband, was deemed sufficient. Yet even here the cases are contradictory, or else they are separated by very subtle distinctions, for in *Blackwood* v. *Norris*, (cited in *Cas. temp. Talbot*, 43.) where a wife had 4000 pounds devised in trust for her separate use, the Master of the Rolls would not, on a bill by husband and wife, allow the trustee to pay to the husband, though the wife was in court and consenting.

The only question in *Peacock* v. *Monk*, (2 *Vesey*, 190.) was, whether the wife could make a will of real property purchased by her during coverture, and there is no decision that affects the general question; but Lord *Hardwicke* said that the wife might dispose of her separate personal estate, by act in her life, or by will, though nothing was said in the marriage settlement as to the mode. The nature of *the act* is not here explained, and he probably meant by deed, as contradistinguished from a will; but he went further with his *dicta*, and said, that the wife could charge her separate estate by her bond. The cases that have occurred on this point have been considered. Mere *dicta* are dangerous guides; and if listened to as authority, they become very prejudicial to free investigation and accurate science. When any great principle of law is under discussion, it is safest to recur only to the decision of adjudged cases, and to confine them to the point in controversy.

In *Grigby* v. *Cox* (1 *Vesey*, 517.) there was a marriage settlement of an estate, in trust for the wife, to receive the rents and profits for her separate use, and as she should direct and appoint. There was no form of appointment mentioned. She, by deed of appointment, sold part of the estate to a third person, without consulting her trustee, and with the concurrence of her husband. Lord *Hardwicke* held the purchase to be valid, and the consent of the

1817.

METHO: EPIS.
CHURCH.
v.
JAQUES.

trustees not necessary. He laid down the rule of the court to be, that where any thing is settled to the wife's separate use, she is considered as a *feme sole*, and may appoint in what manner she pleases, and that her trustees need not join, unless made necessary by the instrument; and that the wife might make an appointment in favour of the husband, if fairly procured, without improper influence, by ill, or by extraordinary good usage, to induce her to it.

The answer of the wife in that case, (*See Belt's Supplement*, p. 218.) averred, that she had executed the deeds by the threats and compulsion of her husband, but the answer was not supported by proof; yet this very defence admonishes us of the danger of allowing the wife to act without the aid of her trustee, who was created for her protection, and who constitutes, perhaps, the only sufficient shield against the undue, secret, and powerful influence of the husband.

In the next case of *Pawlet* v. *Deleval*, (2 *Vesey*, 663.) the subject of the wife's power, in the disposal of her separate property, came again in discussion. The wife by an agreement with the husband upon the marriage, had property vested in trustees for her separate use. During the coverture, she and her husband called in the money, and by two deeds executed by them and the trustee, they recited the fact of the property being in trust for her separate use, and that it was subject to her direction and appointment, *without any particular form prescribed*, and that the husband and wife had agreed to receive the money, and discharge the trustee. The money was paid to them, with the approbation of the trustee, and reinvested, in the husband's name, and the trustee discharged. The husband continued to receive the interest afterward during his life, and the wife, as his executrix after his death, by various acts, affirmed the transaction. Lord *Hardwicke* held her barred; but in the long and elaborate opinion which he delivered, he relied on the *confirmation* she had given when a widow;

and "it is very clear," said Lord *Rosslyn*, in a subsequent case, "that the Chancellor, in this case, did not entertain the idea that a married woman, having separate property, was, to all intents and purposes, placed on the same footing as a *feme sole*." He mentioned the agreement to vest the property in the husband as being under *their hands and seals*, and that the trustee was an executing party.

There were several observations made in the course of this opinion by way of illustration, which formed no part of the decision. Thus he said, he knew of no determination requiring the intervention of a trustee, or a judicial consent in court, to enable the wife to dispose of her separate property to her husband, and that there were instances where the wife, by acts *in pais*, had parted with her property to her husband, and also, where they had *pledged* a part of it for his debts. But he admitted, that *if the circumstances required by the trust had not been pursued*, the court might disregard the disposition.

These are the material cases on the subject in the time of Lord *Hardwicke ;* and though these decisions have been considered as controlling the better judgment of Lord *Thurlow*, and as binding Lord *Eldon* to allow the wife a power of disposition beyond the policy and intention of the settlement; yet it is to be observed, that not one of them gives the wife a right of disposal contrary to the form of appointment prescribed by the instrument, and it would seem that these decisions have been cited in support of doctrines which they can never be made to sanction. The most objectionable parts of those cases are not decisions, but extra-judicial *dicta*.

There is one decision of Lord *Hardwicke* which ought not to pass unnoticed, because, he was there induced to maintain the limited powers of the wife, contrary to the language of the former cases. I allude to the case of *Caverley* v. *Dudley & Bisco*, (3 *Atk.* 541.) where an es-

tate, real and personal, was settled in trust, to pay the pro-
duce thereof to the wife for life, for her separate use, ex-
clusive of her husband, and she borrowed money on an
annuity for her life granted out of that estate. The chan-
cellor held, that " it was not the intention of the grantor
that the wife should anticipate the produce of her estate,
by raising money upon it, and words should have been
thrown into it to restrain her from doing it, but as there
were no such words, she might raise money by way of
loan, but not by way of annuity for her life, as it was too
large an anticipation." This decision is evidently incon-
sistent, for it must have been as much against the intention
of the settlement that she should anticipate the produce
of the estate by loan, as by an annuity, and Lord *Eldon,*
in *Jones* v. *Harris,* (9 *Vesey,* 494.) pointedly condemns
such arbitrary dealing with a contract.

In *Newman* v. *Cartony,* (3 *Bro.* 347. note, and 568.)
there was a stretch beyond any of the preceding decisions,
for the wife had a legacy given for her sole use, with a
power of appointment by will, and in default, to her exe-
cutors, and Lord *Bathurst* ordered the money to be paid to
the husband, with her consent. The note of the case is
extremely imperfect, and we are left to infer that it was
the case of a bill filed, and a consent given in court. But
the objection to the case is, that the grantor had prescri-
bed the mode of appointment, by will, and the mention
of a particular mode excluded others. The property was
intended to be unalienable, except in the mode prescribed;
and what right had the court to defeat the settlement?
The argument in support of the decision may be, that the
wife had an absolute gift, with all the rights of owner, as
a *feme sole,* and that the restriction on her right of dis-
position, except by will, was inconsistent with that right,
and void. This argument proves too much, for it would
destroy all the express limitations and provisoes thrown
into these settlements; and besides, such a technical legal

CASES IN CHANCERY.

'93

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

objection is inapplicable to the views with which these provisions are considered, and the purposes for which they are upheld in equity.

The case of *Hulme* v. *Tenant*, (1 *Bro*. 16.) was the one that first brought the subject of these settlements before Lord *Thurlow*. A leasehold and freehold estate had, on a marriage settlement, been conveyed to trustees, to receive and pay the rents and profits to the wife for her separate use, and to convey the estate itself to such use as she, by deed or will, should appoint. The wife joined in a bond for her husband's debts, and on a bill filed by the obligee, seeking to enforce the bond against the wife's separate estate, Lord *Bathurst* dismissed it; but on a rehearing before Lord *Thurlow*, he sustained the bill, and directed an account of the rents and profits of the leasehold estate of the wife, for the purpose of satisfying the bond. He would not touch the freehold estate. Lord *Eldon* said, (9 *Vesey*, 188.) that this was a prodigiously strong case, though it was afterwards shaken. It cannot be considered as very strong, on the ground of authority, for the preceding chancellor was of a different opinion, and made a different decree in the very case.

In giving his opinion in that case, the Lord chancellor held that a *feme covert*, acting with respect to her separate property, was competent to act in all respects, as if she was a *feme sole*; yet this rule does not appear to be consistent with what he says, in this same case, when he holds that it is different where the consent of the trustees is made essential. He maintained, that a court of equity would make a *feme covert* bound to the whole extent of her separate estate for her personal engagements, yet he admits that her bond was void, as such, and that there could be no personal decree against her, and that he could not touch her real estate, by ordering her to execute the power of appointment, to satisfy her personal engagement. The great difficulty which the chancellor had in granting the

remedy, and the necessity he felt of stopping short of entire relief, arose from the innovation which had been made upon the principle of these settlements. The whole decision was perplexed and inconsistent. The giving the bond had nothing to do with an exercise of power over the separate estate, and was no execution of a power of appointment. If it was, it ought to have bound the land, as well as the rents and profits; and if the wife's bond, having no reference to her estate or power over it, be available, she may equally bind herself by all possible personal engagements, as much as a *feme sole*, to the extent of her property.

But Lord *Thurlow*, afterwards, in *Ellis* v. *Atkinson*, (3 *Bro.* 347. note, and p. 565. *Dickens*, 759. S. C.) paused upon the consequences of this doctrine, and doubted very much whether, upon a settlement in trust that the interest of money in the funds be paid into the hands of the wife, or as she should by writing, from time to time, appoint, he could even accept of the wife's consent in court, on a bill by husband and wife, to carry into effect an agreement of theirs, by a sweeping disposition, by deed, that the interest for their joint lives should be paid to the husband. However, after several hearings, and long consideration, he made the decree in pursuance of the wife's deed, and her consent in court.

This case was by no means so strong as that of *Hulme* v. *Tenant*; and upon the principles of that decision, there could have been no hesitation. But here the appointment of the interest was to be *from time to time*; and the intention undoubtedly was, that the power was to be exercised occasionally upon the dividends as they should grow due, and not by way of anticipation upon the whole at once; and if that intention had prevailed, instead of the technical rule of law, which holds such qualification upon the power of disposition to be inconsistent with absolute

ownership; the decision in that case must have been different.

The same point arose again, in *Pybus* v. *Smith*, (3 *Bro.* 340. 1 *Vesey,* jun. 189. S. C.) In that case, there was a settlement after marriage of real and personal estate, in trust, to pay the rents and dividends, as the wife should, in writing, *from time to time,* direct; and in default thereof, to pay them into her own hands, for her separate use. She and her husband, by deed, conveyed the property, by a general sweeping appointment, to her husband's creditors, as a security for his debts. On a bill by the creditors, Lord *Thurlow* carried the deed into effect, but he professed to act upon the authority of the prior cases, and directly against his own inclination and judgment. He said, that "if the point was open, he should have thought that a feme covert, who had a separate estate, should not part with it without a judicial examination;" and he wished to adopt the principle that, "so far forth as the instrument, creating her separate estate, makes her proprietor, so far she was a feme sole; and if she had pledged the estate, according to her power, the trustees must hold it to the uses she appoints." He said further, that "If the trust was to pay the rents and profits to her, upon any instrument signed by her since the last pay day, an instrument signed before would not do." Yet he concluded that he had gone too far on a former occasion, and that if the *feme covert* "saw what she was about," the court must support her alienation.

I cannot see the propriety of holding the court, forever thereafter, bound by a decision made on principles confessedly false, or pushed "too far." It is admitted, in this case, again and again, that the wife has no power over the estate but what the instrument gave her; and this is a doctrine intelligible, just, and sound. "If it was the intention of the parent," he observes, "to give a provision to a child in such a way that she cannot alienate it,

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

he saw no objection to its being done, but such intention must be expressed in clear terms." This was making the whole question turn upon a fair construction of the deed of settlement, and rather than give these words, *from time to time*, an operation according to the sense, in consequence, perhaps, of the embarrasment created by these decisions, Lord *Thurlow*, in Miss *Watson's* case, caused these words, *and not by anticipation*, to be inserted in the deeds of settlement, as a bar to these improvident and sweeping dispositions, by the wife, of all her future interest in the provision. (1 *Rose*, 200. 11 *Vesey*, 221.) And Lord *Eldon*, in a recent case, (*Jackson* v. *Hobhouse*, 2 *Meriv.* 483.) said, that Lord *Thurlow* adopted this proviso against the wife's assigning her interest by any mode of anticipation, after struggling hard, for a long time, to bring the wife into a situation consistent with the manifest intention of the settler; and he held such a proviso valid, and so did Lord *Alvanley*. This proviso has been followed ever since, and it was supported by Lord *Eldon* in the case referred to.

We come next to the case of *Sockett* and wife v. *Wray*, (4 *Bro.* 483.) which overturned much of the doctrine of Lord *Thurlow*, and which, on many accounts, merits all our attention.

The settlement was of stock, in trust, and by a deed, to which the husband and wife were parties, to pay the dividends to the wife for her separate use, and with power in her to dispose of the stock by will. The husband and wife, by bill, sought to compel the trustees to sell the funds, and pay the money to the husband. The Master of the Rolls, (Lord *Alvanley*,) held, that the wife could not waive the benefit of the settlement, and give the capital away; and that she could only dispose of it in the mode provided by the settlement, which was by will, being an act ambulatory and revocable in her lifetime. He held, *that the wife had no disposing power but what was given her*

*by the deed,* and he meant to question the decision in *New-man* v. *Cartony,* and *Hulme* v. *Tenant, Ellis* v. *Atkinson,* and *Pybus* v. *Smith.*

This case has been much doubted since, and it would seem to have been directly overruled by Sir *Wm. Grant,* in *Heatley* v. *Thomas,* (15 *Vesey,* 596.) for it was there held, upon a parallel settlement and power, that the wife had an absolute interest, and might bind the estate by her bond, and was not confined to the will, which was the mode prescribed. But it appears to me, with great respect for the contrary authority, that this decision of Lord *Alvanley,* was founded on sound principles of equity and policy, and applicable to the case. So, in *Hyde* v. *Price,* (3 *Vesey,* 437.) where the husband had settled an allowance, for their joint lives, on the wife, by way of separate maintenance, Lord *Alvanley,* would not permit the wife to grant an annuity out of the dividends, for that would defeat the intention of the instrument, and leave the wife without a maintenance. I do not know that this last decision has ever been questioned, yet it seems to rest on the same principle as the other, of giving effect to the intention of the instrument, and to the policy and utility of the provision; and the wife had, in equity, as clear and stable an interest in these dividends, as she could have had in any other property, by settlement.

Lord *Rosslyn* has, in several instances, pursued the same course of reasoning and decision, and dissented entirely from the extreme length to which Lord *Thurlow* had pushed the disposing power of the wife.

In *Milnes* v. *Burk,* (2 *Vesey,* jun. 488.) he observed, that he did not assent to the position in its full extent, that where a married woman had separate property, she was, to all intents and purposes, to be considered a *feme sole.* This doctrine had been carried a great deal further than it was meant, and he did not think it ought to be applied to transactions with her husband, for that would throw down

all the guards which the maxims of the common law, and the prudence and care of the court, had established, with regard to trust estates, in equity, and the influence of husbands. He said, that *Pawlet* v. *Delaval* was the only case arising directly upon a gift between husband and wife; and there Lord *Hardwicke* placed the validity of it essentially upon the confirmation of the wife after her husband's death.

In *Whistler* v. *Newman*, (4 *Vesey*, 129.) Lord *Rosslyn* went more largely and freely into the consideration of this perplexed and litigated subject.

The settlement, in that case, was of stock, the property of the wife, in trust, to pay the dividends into the hands of the wife during her life, for her separate use, free from the debts, intermeddling or control of the husband, and that her receipt alone should be a sufficient discharge, and after her death, to the use of the husband for life, and then to her children, or according to her appointment by will. The trustees, at the request, of the wife, sold the estate, and paid the money to the husband, taking his bond of indemnity to which the wife was a witness. The husband died insolvent, and the widow and children, by bill, sought to compel the trustees to replace the stock, and pay the dividends to the widow from the husband's death.

It was contended on one side, (and Sir *John Scott* was one of the counsel who so contended,) that, according to the decisions of Lord *Thurlow*, the wife was competent to deal with that property as a *feme sole*, by becoming surety for her husband's debts, or by making him a present of the whole fund ; while on the other side it was contended, that it was not within the provisions or intention of the settlement, that she should assign the whole fund.

It is to be observed, that here was no mode of disposition or appointment of her life estate mentioned, and the case does not, therefore, come up to those where a mode of appointment is mentioned. But the chancellor consi-

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

dered the act of the trustees, a gross breach of trust, for they were constituted to guard the wife against the influence of the husband. He considered that the act of taking a bond of indemnity, and getting the wife's consent by making her witness the bond, was an iniquitous desertion of their duty. It was considered that the wife had no power in that case to assign the stock itself, or the principal. The chancellor took occasion to observe, that the doctrine in *Hulme* v. *Tenant*, took away all protection from married women, and made trusts for their benefit of very little importance; that if this rule in that case, and in *Pybus* v. *Smith*, and *Ellis* v. *Atkinson*, was to be pushed to its full extent, a married woman having trustees, and her property under the administration of chancery, was infinitely worse off, and more unprotected, than she would be if left to her legal rights, which the husband cannot, *proprio marte*, affect. Her legal rights could not be taken from her, (as was attempted in that case,) without a formal deed, or by implication and inference from conversations and conduct. Upon *Pybus* v. *Smith*, it would be the vainest act to make a settlement. Lord *Rosslyn* evidently considered, that there was a great difference between a dealing between the husband and the wife, or between a creditor and the wife, in respect to her separate interest, and that the same strictness might not be necessary in the latter case. He thought, that if a creditor, dealing with a married woman, had got any legal hold of her property, equity might leave the legal right undisturbed, but would certainly never assist or improve it.

The last case on the subject before Lord *Rosslyn*, was that of *Mores* v. *Huish*, (5 *Vesey*, 692.) in which the wife had a life interest given to her in the rents of a freehold estate, without any power of appointment, otherwise than that the same were to be solely *at her disposal*. She joined with her husband in securing an annuity to a purchaser, upon these rents, who took the security, contrary to the

remonstrance of the trustee. The bill was filed by the purchaser against the trustee, and the chancellor refused to aid him, and doubted whether a trust to receive rents, and pay them, from time to time, was a trust to pay by anticipation. This decision arose from Lord *Rosslyn's* reluctance to sanction these improvident and sweeping dispositions of the wife; but the case was clearly overruled in *Essex* v. *Atkins*, (14 *Vesey*, 542.) on the doctrine, that if the wife acts freely, she can bind her separate property, without the assent of the trustees, unless the instrument giving her the property render that assent necessary.

Under such restrictions, and amidst such confusion and alternation of authority, stood the disposing power of the wife when Lord *Eldon* succeeded to the great seal. I do not intend to fatigue myself with entering minutely into the consideration of all the dubious and contradictory cases and opinions to be found since that time, and shall notice only a few of the most material and prominent decisions. The law of the court will be found to be ultimately settled, that the terms of the instrument are to govern, and the intention of the settlement, with its restrictions, is to prevail.

In *Sperling* v. *Rochfort*, (8 *Vesey*, 164.) there was a bill by husband and wife against trustees, to be permitted to give up her interest for life in a trust fund, but as the estate was not settled to her separate use, the question on the extent of the wife's power over her separate estate secured by a settlement, did not arise. The chancellor, however, took occasion to observe, that upon all the cases together in respect to the wife's power, it was impossible to know the result, and that those before Lord *Hardwicke's* time went very much to the extent, that to all intents, as to separate property, the wife was to be considered a *feme sole.* In *Hulme* v. *Tenant*, the bond was nothing like the execution of a power, and yet Lord *Thurlow* held it a sufficient indication of the wife's intention to bind

her.  So, in *Pybus* v. *Smith*, the property was guarded by those terms which are thrown into the settlement for her protection, and yet Lord *Thurlow* most reluctantly allowed the wife's disposition for the benefit of her husband's creditors.  There was the same reluctance, but the same decision, in *Ellis* v. *Atkinson*.

In such strong language, did his lordship expose the injustice and unreasonableness of the decisions of Lord *Thurlow ;* and he added, that though he could not reconcile all that was said by Lord *Rosslyn*, in *Whistler* v. *Newman*, to former cases, he wished the law might turn out for the protection of married women, to the extent in which it is there represented.

In *Rich* v. *Cockell*, (9 *Vesey*, 369.) stock was settled in trust to pay the proceeds for the sole and separate use of the wife as she should direct, and that her receipt was to be a sufficient discharge to the trustee.  The power of disposition, whether by deed, will, or other writing, was not determined in that case; and Lord *Eldon* said, that it was settled in *Fettiplace* v. *Gorges*, (1 *Vesey*, jun. 46. 3 *Bro.* 8.) that the wife had a power of disposition by will, as incident to such an interest, though as to other property she cannot make a will without her husband's assent.  He thought she might have a power to dispose by an instrument not amounting to a will.  He did not specify what other instrument would be sufficient, though a gift to the husband could not be inferred without clear evidence.  The learned counsel insisted, that the court would, at least, require some declaration in writing.  Again, in *Jones* v. *Harris*, (9 *Vesey*, 497.) Lord *Eldon* considered it to be an open question, and one doubtful, *and deserving of a very full review*, whether the separate property of a *feme covert* might be charged in a different form from that prescribed by the instrument, on the ground that she was to be considered, to all intents and purposes, as a *feme sole*.

Metho. Epis.
Church
v.
Jaques.

It will be recollected, that the settlement in the case before me, prescribed the mode of disposition to be by deed or will, and that the husband has set up, in his own favour, a disposition by parol; I have, accordinlly, adopted the advice given by this eminent judge, and have endeavoured to give "a full review" of the cases, and they have produced an entire conviction, in my mind, that such a parol disposition, or any other different from the one prescribed, is, and ought to be, inadmissible.

In the above case, there was nothing said about a power or mode of disposition. So, in *Wagstaff* v. *Smith* (9 *Vesey*, 520.) there was the like settlement of dividends of stock upon the wife, without words of direction, appointment, control, or restraint, and the Master of the Rolls held the power of disposition to be incident, that the wife might make such disposition as she pleased, and, therefore, her assignment, to secure an annuity with her husband, was established.

Sir *Wm. Grant*, in that case, observed, that there were cases in which the question was, whether the absolute property, including a power of disposition, was intended to be given, or whether there was an intention to limit the wife to a personal gift, without a power of disposition. The principle admitted in these remarks, that the *intention* of the instrument of settlement is to prevail, is solid, and it is all that we contend for; but it must be confessed, that the cases make distinctions on this point, too refined to be useful, and so subtle as to be dangerous. Mr. *Sugden*, in his excellent "*Treatise of Powers*," (p. 114.) complains of this subtlety, and says that it is almost impossible for a practitioner to advise confidently on any case where the very words have not received a judicial determination. We have a sample of this species of discrimination in *Richards* v. *Chambers*, (10 *Vesey*, 580.) where property was settled in trust for the sole and separate use of the wife for life, and if she survived her husband, then to her

absolutely; but if not, then, as she by deed or will should appoint. She executed an appointment in favour of her husband, and they both applied to the court to have it confirmed. The Master of the Rolls held that she had a contingent interest, in the event of surviving her husband, which she could not give up while in a state of coverture. She had an estate for life with a contingent interest in fee, and a power to dispose of that interest, by deed or will. He said, "that the wife, while *sui juris*, means to make a provision for herself in the event of her surviving her husband. Such are the terms upon which alone she chooses to contract, while in a condition to exercise her free and unbiassed judgment. She wishes to put that out of her reach, and secure it from the effect of the influence and solicitations, to which she may be afterwards exposed. Why should a court of equity, profesing to watch over the interests of married women, say that a woman about to marry should not be allowed to secure to herself this kind of protection, arising from a legal incapacity to act?" "The husband can have no claim of right to her interest, with his concurrence created for her benefit."

1817.

Metho. Epis. Church v. Jaques.

It appears to me, that this reasoning condemns many of the cases we have reviewed, and goes to sanction all that Lord *Alvanley*, and Lord *Rosslyn*, have said on the subject, and to bear against many of the subsequent decisions of this same Master of the Rolls.

In *Parker* v. *White*, (11 *Vesey*, 209.) the subject came again before Lord *Eldon*, and was much discussed. The chancellor disclosed the impression which he had received, as early as the case of *Whistler* v. *Newman*, for he says, that he then thought the law settled by the cases of *Ellis* v. *Atkinson*, *Pybus* v. *Smith*, *Hulme* v. *Tenant*, *Peacock* v. *Monk*, &c.

In that case an estate was conveyed in trust, for the use of the wife for life, solely and separately, free of her hus-

band, &c. and in trust, after her death, to such persons as she should by will appoint, and in default thereof, she had an eventual reversion in fee. The husband, wife, and trustee, united in a deed conveying her life estate, and the husband and wife, afterwards, levied a fine of the estate, and she devised it to the purchaser. On a bill by her to set aside these conveyances, charging a want of consideration, and the conduct of the husband, the sale was established as to her life estate, and reversionary interest, but her will was set aside, and the trustee held guilty of a breach of trust.

In discussing the case, Lord *Eldon*, observed, that it was extremely important, that the power of the wife over her separate estate should be, once for all, well decided, and *that his mind was in great distraction upon the subject.* He admitted that Lord *Thurlow* felt a very strong inclination to control the unlimited power of the wife, and that his reasoning in *Pybus* v. *Smith*, was unanswerable, if the point had been open. He seemed to think, that upon true principle, if the settlement made the wife *so far* a *feme sole*, yet that the nature and extent of her capacity ought to be collected *from the terms of the instrument from which she derives that capacity.* It is to be regretted, that his lordship did not feel himself at liberty to follow such a plain and unanswerable argument, for the wife in that case, having a power by will to appoint after her death, the instrument evidently intended that she should exercise her power over *that part* of her interest in no other way ; *expressio unius est exclusio alterius.* Lord *Eldon* continued to observe, in that case, that informal instruments, and acts of different sorts, had been held a sufficient evidence of the wife's intention, and that it was no objection, if the disposition is to satisfy the debt of the husband, or be a gift to him ; and he concluded, that the decision in *Whistler* v. *Newman* was inconsistent with all the declarations of the court, for a century.

With the highest respect for the learning of Lord *Eldon*, I have not been able to perceive sufficient evidence of the historical accuracy of some of these *dicta*. I do not know in what case the wife's disposition of her separate property was admitted, where there was not some pretty formal and authentic evidence of her intention; and the decision of Lord *Rosslyn* was not such a lawless departure from all precedent. The wife, in the case he alluded to, had a mode prescribed, as to the disposition of the stock after her death, viz. *by will ;* and yet she sold the whole at once, for the benefit of her husband. This was, indeed, contrary to *Newman* v. *Cartony*, but that case had been overruled by *Socket* v. *Wray*. Lord *Eldon* uniformly admits the true principle to be with Lord *Rosslyn*, and that Lord *Thurlow always thought so*, and that the point was unsettled, confused, and *distracting*. Why, then, may we not decide according to sound principle, and place the rights of the wife on a safe and durable foundation?

In a series of cases decided by Sir *Wm. Grant*, the doctrine has been maintained, that the wife had a disposing power over her separate property, without examination, and without the assent of trustees, when the instrument of settlement did not restrain her, and that the power extended as well to her reversionary interest, as to that in possession. But in some of these cases, I apprehend, the doctrine has been applied, when a fair construction of the instrument did not seem to warrant it; and the decisions of that very able and enlightened judge, appear to me to be a little inconsistent with each other, or to be founded on distinctions not easily to be perceived. Thus, in *Witts* v. *Dawkins*, (12 *Vesey*, 501.) the trust was to pay the profits of land to her appointment, *from time to time*, yet she was allowed to make a sweeping appointment, by sale at once, of her whole life interest. So in *Sturgis* v. *Corp*, (13 *Vesey*, 190.) there was a trust to *pay and apply the dividends of stock into her proper hands*, for her

1817.

METHO. EPIS.
CHURCH.
v.
JAQUES.

separate use, after the death of *A.*, and she was allowed to sell this reversionary interest in the life time of *A.* This was, to all appearance, a mere personal interest, over which no such power existed; and so Sir *Wm. Grant* had held, in *Hovey* v. *Blakeman*, cited by him in *Wagstaff* v. *Smith*, (9 *Vesey*, 524.) The two decisions are irreconcilable; and Mr. *Sugden* thinks, that if *Hovey* v. *Blakeman* had been reconsidered, the decisions would have been otherwise. I think, with that writer, that one of the cases was erroneously decided, but I should differ from him in the selection of the case. Again, in *Brown* v. *Like* (14 *Vesey*, 302.) there was a trust to pay dividends to the wife for life, for her separate use, and her receipts, *from time to time*, to be good; yet her sweeping power of appointment was established. In *Heatly* v. *Thomas*, (15 *Vesey*, 596.) there was a like trust, with a special power to dispose of the principal *by will*, and yet her bond was enforced against her separate estate. The like decision was made in *Bullpin* v. *Clarke*, (17 *Vesey*, 365.) where the trust was to pay the rents into her hands, or as she should appoint, and they were held bound to a creditor in satisfaction of her note, though the note had no reference to her settled property, and was not, by any reasonable intendment, an appointment under the power. But in *Lee* v. *Muggeridge*, (1 *Vesey & Beame*, 118.) where the trust was to pay the rents, as the wife should by writing direct, during the joint lives of her and her husband, and to her use in fee, if she should survive him, and if he survived her, to the use of such persons as she should *by will* direct, and no power of disposition over it, during the coverture, was mentioned, the Master of the Rolls held, that the income only, and not the capital of her separate estate, could be bound by the bond.

The last case I shall mention, is that of *Francis* v. *Wigzell*, (1 *Maddock's Ch. Rep.* 258.) which arose on a bill for a specific performance of an agreement of husband and

wife to sell, she having separate property. I cite the case only for the opinion of the vice-chancellor, in which he lays down this proposition; that "a *feme covert*, having separate property to her own use may, generally speaking, dispose of it as a *feme sole*; but if the instrument by which she acquires it, prescribes any particular mode by which she must part with it, *her disposition of the property must be according to the terms of such instrument.*" Now this declaration, if it be worth any thing, brings the point back again to the doctrine of Lord *Alvanley*. *Sit modus lasso viarum.*

I apprehend, we may conclude, (though I certainly do it with unfeigned diffidence, considering how great talents and learning, by a succession of distinguished men, have been exhausted on the subject,) that the *English* decisions are so floating and contradictory, as to leave us the liberty of adopting the true principle of these settlements. Instead of holding that the wife is a *feme sole*, to all intents and purposes, as to her separate property, she ought only to be deemed a *feme sole*, *sub modo*, or to the extent of the power clearly given by the settlement. Instead of maintaining that she has an absolute power of disposition, unless specially restrained by the instrument, the converse of the proposition would be more correct, that she has no power but what is specially given, and to be exercised only in the mode prescribed, if any such there be. Her incapacity is general; and the exception is to be taken strictly, and to be shown in every case, because it is against the general policy and immemorial doctrine of law. These very settlements are intended to protect her weakness against her husband's power, and her maintenance against his dissipation. It is a protection which this court allows her to as-

1817.

METHO. EPIS. CHURCH. v. JAQUES.

A *feme covert*, with respect to her separate property, is to be considered a *feme sole*, to the extent only of the power given to her, by the marriage settlement. Her power of disposition is not absolute, but *sub modo*, to be exercised according to the mode prescribed in the settlement. If she has a power of appointment by *will*, she cannot appoint by *deed*. If she has a power to appoint by *deed*, the giving a bond or note, or parol promise without reference to the property, or making a parol gift of it, is not such an appointment. So, where it is said in the settlement, that she is to receive from her trustee the income of her property, as it may, from time to time, grow due, she has no power, *by anticipation*, to dispose, at once, of all the income.

sume, or her friends to give, and it ought not to be rendered illusory.

The doctrine runs through all the cases, that the intention of the settlement is to govern, and that it must be collected from the terms of the instrument. When it says she may appoint by will, it does not mean that she may likewise appoint by deed; when it permits her to appoint by deed, it cannot mean, that giving a bond, or note, or a parol promise, without reference to the property, or making a parol gift, is such an appointment. So, when it says that she is to receive from her trustee the income of her property, as it, from time to time, may grow due, it does not mean that she may, by anticipation, dispose at once of all that income. Such a latitude of construction is not only unauthorised by the terms, but it defeats the policy of the settlement, by withdrawing from the wife the protection it intended to give her. Perhaps, we may say, that if the instrument be silent as to the mode of exercising the power of appointment or disposition, it intended to leave it at large, to the discretion and necessities of the wife, and this is the most that can be inferred.

There being, in the present case, a clear mode of appointment prescribed, it would be unjust, and contrary to the settlement, to allow the defendant who was a party to the instrument, to set up any parol confesssion or agreement of the wife, as a title to her property; the exception is consequently overruled.(a)

Exception overruled.

(a) *Vide* the case of *Ewing* v. *Smith*, (3 *Desaùsure's Rep.* 417.) in which the court of appeals in *South Carolina* decided, after a very full discussion and consideration, that Lord *Thurlow's* doctrine was not correct, and that a *feme covert,* in respect to her separate property, was not, to all intents and purposes, a *feme sole*: that such a principle would defeat the object of the settlemement, and the security of the wife: that her power of disposition was not incidental to her separate property, but derived entirely from the authority contained in the settlement, and that the power of appointment must be clearly given and the mode prescribed strictly pursued. The contrary opinion, however, was maintained by the

*Thirteenth exception.* That the master has not allowed to the defendant 213 dollars and 15 cents, paid for the funeral expenses of his wife.

THE CHANCELLÓR. The will of Mrs. *Jaques* provided for the payment of her funeral expenses out of her estate; and without such a provision, I admit, the husband must have borne this charge. (*Bertie v. Chesterfield, 9 Mod. 31.*)

Exception allowed.

*Fourteenth exception.* That the Master has not allowed to the defendant the several sums appearing, by a certain exhibit marked No 1. produced by the plaintiff's, to have been paid, and amounting, in the whole, to 9,913 dollars, 44 cents, of which sum 6,213 dollars, 14 cents, is stated to have been paid for houses formerly belonging to *Christian M. Heyle.*

THE CHANCELLOR. It is impossible to allow the sedischarges without palpable injustice. They are generally so vague, without saying to whom or for what, that they are not the proper subject of allowance, in any case, without further proof. A party is never allowed for any thing in account, under the head of *general expenses*, without naming the particulars, for it would be impossible, in that way, to guard against error, double charges, and imposition. (*Wyatt's P. R. 4. 1 Eq. Cas. Abr. 11. pl. 12.*) The defendant is not charged on the foot of this paper, but on the foot, essentially, of his answers and receipts, and other proof, and the reference to it by the master was altogether unnecessary. The paper is some loose and random charge of disbursements, without accuracy or consistency. The

---

1817.

METHO. EPIS. CHURCH *v.* JAQUES.

If a *feme covert* having a separate estate, secured by settlement, provides by her will for the payment of her funeral expenses, the husband is not to be charged with them; otherwise, if no such provision had been made.

---

chancellor, *Desausure* in an able and learned argument delivered by him in the cause. *Vide*, also, *Jackson v. Hobhouse*, 2 *Merivale's Rep. 483.*

1817.

METHO. EPIS. CHURCH

v.

JAQUES.

money paid for houses formerly belonging to *Heyle*, is here stated at 6,213 dollars, 15 cents, whereas the answer admits it to have been 8,026 dollars, 97 cents. It is probable that many of the *items* here mentioned have already been allowed when they were duly understood and explained. Besides, why should the defendant have credit for 6,213 dollars, 15 cents, paid for *Heyle's* property, when the payments, as far as any *were* made, were with the proper moneys of his wife? Nothing can be more obviously unjust and groundless than the claim of such an allowance. He admits, in his answer, that he purchased, on the sale under *Heyle's* mortgage one lot for 4,500 dollars, and another lot for 1,500 dollars, and that he did not pay a cent for them, but the price was discounted against so much money due on the mortgage and judgment of his wife. Yet in this exception the defendant charges the 6,213 dollars, 15 cents, as so much money *paid* for that property. This single fact demonstrates the obvious falsehood and injustice of the claim thus put forward. It throws discredit on all the *items*.

The defendant had already been allowed such of his disbursements as were supported by proof, and as to many charges, he has had the benefit of a most liberal indulgence, and perhaps, a great deal too much, to be consistent with the demands of a severe and exact justice.

One instance more will be produced to show the utter want of truth and justice in these claims. The claim of 300 dollars, as cash paid to *Bazen*, under date of the 1st of *May*, 1807, has been allowed to the defendant. (See schedule C. annexed to the master's report, No. 158.) There is no doubt of the general rule that when one party exhibits a paper, in proof, to charge his opponent, his opponent is entitled to use it in his discharge. But it does not follow, that each part is entitled to the same credit. The charge may be so clear and specific as to be conclusive, while the discharge is so loose and defective as to deserve

*A party, in an account before a master, under the head of general expenses, is not to be allowed any thing, without specifying the particulars.*

*Where one party produces a paper to charge the other, his opponent may use it in his discharge; but it does not follow that each part is entitled to the same credit.*

*Where the discharges are inaccurate in some instances, and are destitute of precision and certainty as to place and circumstances, &c. the whole may be rejected.*

no credit. We have seen that those discharges are inaccurate in some instances, that they have no precision or certainty, as to place or circumstance; that we have evidence of the allowance of part on other proof, and of the *positive* injustice of other parts, and we are justified, and bound, upon all sound principles, to reject the whole.

The whole exception is, accordingly, disallowed.

A question will arise as to the disposition of the costs upon these exceptions. The allowance of costs is, no doubt, discretionary in this, as in other cases, but, I think, it will, upon the whole, be most equitable and just to follow the rule which I have adopted in other cases, arising upon exceptions to reports, (1 *Johns. Ch. Rep.* 44. 77. 2 *Johns. Ch. Rep.* 223.) and allow to each party the costs on the exceptions in which he has been successful. The idea that a party ought not to pay costs for the mistake of a master, has been so often controlled, on this very subject of exceptions, as to form no safe and certain guide. We have a statute of this state, (laws of *N. Y.* sess. 38. ch. 96. § 13.) which allows costs on reversal of a judgment in error; and I perceive, that the court of errors, on the reversal of decrees of this court, awards costs of the appeal to the appellant. However we may regret the application of costs to such cases, yet, I think, it would be carrying our scruples to a great length, to consider every report, in every case, of a *master*, as partaking so much of the nature of a judicial determination, that the party defending its errors, under exceptions, ought to be protected from costs. This is, certainly, not the established doctrine of the court.

*Costs on exceptions to a master's report are allowed to each party on the exceptions in which they have respectively prevailed.*

*The mistake of the master is not like the error of a judge, and is no rule as to costs.*

Thus, in the case of *The Corporation of Burford* v. *Lenthall and others*,, (2 *Atk.* 551.) there were exceptions to a decree of the defendants, as commissioners of charitable uses, and of these, thirty-nine were allowed, and four disallowed. Lord Ch. *Hardwicke* took time to consider the question of costs, and gave to the exceptants costs upon

1817.

METHO. EPIS.
CHURCH
v.
JAQUES.

those exceptions in which they had prevailed, and to the respondents costs in those where they had prevailed. This is a strong decision, and perfectly applicable, in principle, to the present case. The decision of the commissioners was much more solemn and judicial than that of a master's report. The statute of 43 *Eliz.* ch. 4. which authorized the appointment of commissioners to inquire of the gift of lands and goods to charitable uses, directed that their orders, judgments and decrees should be certified into chancery; and that court was directed to take such order for the due execution thereof, as should seem fit. The statute further provided, that any person aggrieved by any such decree, might apply to the court of chancery, and the court was to annul, alter, or enlarge the order, judgment and decree, according to equity, and award costs of suits, in its discretion, *agaimt such persons as should complain without just cause.* This is all the statute provision in the case; yet Lord *Hardwicke* adopted the rule of costs which I have mentioned, and which he found to be according to the established practice of the court.

There are many cases of reference for mere *irregularity,* where a party has not been allowed costs for a successful exception to the report; yet even there the chancellor held, (3 *Atk.* 234. *anon.*) that they might, in special cases, be allowed, notwithstanding the master had reported in favour of the other party. The case of *Bromfield* v. *Chicester,* (*Amb.* 464.) is another strong instance in which costs have been allowed to a party prevailing in his exception to a master's report. Lord *Northington* allowed costs here, after the point had been twice discussed, and the cases respecting references for irregularities cited and reviewed, and he insisted that the allowance was just in that case, and that it was a matter resting in discretion.

I know of no instance which more strikingly illustrates this doctrine than the order of Lord *Nottingham,* (*vide Beame's Orders,* p. 261.) making even the party prevailing

on exceptions to a master's report, pay costs in certain cases.

I might, perhaps, properly enough, refuse costs on either side in this case; but to make the defendants pay costs where his exception was not well taken, and not to allow him costs when he prevailed, would appear to me to be an unequal rule. The exceptions, in this case, were generally of grave import, and founded on plausible grounds; and I have concluded it would operate most justly to adopt the rule which I formerly declared between these very parties in this same case; and I do it the more readily, as I find that Lord *Redesdale*, (1 *Sch. & Lef.* 241.) established it as a general rule of his court, that where some exceptions were allowed, and others were disallowed, on a reference to a master, the plaintiff was to have the costs of the exceptions disallowed, and the balance to be struck and paid by the party from whom it should appear to be due.(a)

A decretal order was, thereupon, entered, that the 2d. 6th, 7th, 10th, and 13th exceptions, together with so much of the 8th exception, as related to the sum of 250 dollars, therein mentioned; and so much of the 12th exception as related to the sum of 75 dollars, therein mentioned, be allowed as well taken; and that the residue of the said exceptions, and parts of exceptions, be disallowed. That the defendant, *John D. Jaques*, be allowed his costs for the said 2d. 6th, 7th, 10th, and 13th exceptions, and that the plaintiffs be allowed their costs for the residue of the said exceptions, except the 8th and 12th;

(a) In the case of *Dawson* v. *Busk*, (2 *Maddock's Ch. Rep.* 184.) there were ten exceptions taken to the answer, and the master reported the answer sufficient. On exceptions being taken to his report, some of them were allowed, and some disallowed; and the Vice Chancellor, after reviewing the authorities, ordered the deposit, which had been made with the register, on taking the exceptions to the report, to be divided; and this appeared to have been the practice in several cases which were cited.

1817.    and that for these two last exceptions, neither party be allowed costs as against the other; and that the costs to be taxed for the defendants be discounted from the costs to be taxed in favour of the plaintiffs; and that the report be recommitted to the master to be amended, in conformity to this decretal order.