The opinion of the Court was delivered by
O’Neall, J.
At common -law a feme covert was regarded as legally incapable of making any contract which would bind her. This disability was intended to be her protection. It was founded on the notion that her existence was legally merged in her husband. They were regarded in law as one *42 person. She was supposed to have no will of her own, and hence' was incapable of charging herself by contract. Neither could she have a personal estate which did not vest in the husband, jure mariti: froto her teal estate, he was during coverture entitled to the receipt of the rents, issues, and profits, and after her death.he was entitled, if there was issue of the marriage born alive, to hold during his life, by the curtesy, the whole of her land, of which he had actual possession during the coverture. In- the progress of time, and out of- the refinements, and perhaps the necessities of society, it was' permitted-in Equity that the wife should- have both real and personal estate separate from her husband: Incidental to this right of property, it was held, with different modifications at different times, that she was as to it,.a feme sole, with'power to charge or dispose of it. Fettiplace vs. Gorges, 1 Ves. jun. 48. From 'the English cases, it may be deduced, as a general rule, that a feme covert, unless restrained by the -deed of settlement, "had the right, to. dispose of, or charge her'separate personal estate, as a feme sole ; for in Pybus vs. Smith, 1 Ves. Jun. 193, Lord Chancellor Thurlow states the rule to be that “she (a feme covert,) is sole, so far as she has a power of appointment, _ but with any limitations in the deed giving her that power.” In Jackson vs. Hobhouse, 2 Meriv. 483, where, by a settlement, the interest óf a sum of money was to be received to the separate use of the wife, with a proviso against the wife’s assigning of otherwise disposing of the interest in anticipation ; the wife • ' and her . husband ■ in order to obtain an annuity, assigned the future interest, and the Lord Chancellor Eldon held that the clause against an assignment in anticipation was good, and restricted .the power of the wife over her separate estate. He says, “ it is now too late to.contend against the validity of a clause in restraint of anticipation.” In Jacques vs. The Methodist Episcopal Church, 17 Johns. R. 548, the Court of Errors of the State of New-Yorlc, held that a feme .covert, with respect to her separate property, was. tq be regarded in a Court of Equity as a feme sole, and might dispose of it without the *43 assent and concurrence of her trustee, unless she was specially restrained by the instrument under which she acquired her separate estate. In the same case, 3 Johns. Ch. 113, Chancellor Kent, after a full review, and elaborate examination of all the cases, comes to the conclusion, that a feme covert, in Equity, as-to her separate estate, is to be regarded as a feme sole, sub modo, or to the extent of the 'power clearly given by the settlement. In Ewing vs. Smith, 3 Des. 417, a majority of the Court of Appeals in Equity in this State held, “ that a married Avoman who has a separate estate cannot part with it in an}r Avay without an examination; that as by marriage she loses all the powers of a feme sole, a separate estate does not confer all those powers on her; and that therefore, the power of appointing such estate, must be expressly given, and the mode prescribed, be strictly pursued.” Since this decision, the rule has been considered settled as laid down in it, and if I was disposed to doubt its correctness, I should not feel at liberty to lay down another. But I concur fully in its wisdom. To permit any other, would be to defeat every separate estate; for, to the kindness, force, or a necessity created by the acts of an improvident husband, most women tvould at some period be compelled to yield up the property which the kind and prudent care of parents or friends, had intended as a permanent provision for herself. The rule laid down in Ewing vs. Smith, would dispose ’ of this case; for the wife in the deed from which her separate estate is derived, has no power of disposition, and her alienation has been without examination in the Court of Equity. If the deed had merely given her a separate estate without restriction, and she had voluntarily aliened for the .necessary support of herself and her children, her sale might have been sustained, for in that case, the Court of Equity would have permitted the sale to have been made, if it had been applied to for that purpose; and acting upon the Equity maxim, that it considers that as done which ought to have been done, the sale would have been confirmed. In the deed in this case, there is, however, an express restriction upon the power of the wife; *44 after conveying the property in trusp'for the complainant, and the heirs of her body, the) deed provides that it shall not be “subject to any alienation whatever, in case of her marriage) ’and excluding forever every, claim, or pretence of claim, by her húsband to the said slaves.” This, according to the English cases, ..and the decision of the New-York Court of Errors in .the case of Jaques vs. The Methodist Episcopal Church, is such a restraint upon the, power of the wife over her separate property as would prevent her alienation from taking effect. If this restraint had been imposed, on a donee not laboring under any legal disability, it would, even then, prevent an alienation; for unless contrary to. some rule of law, a donor has the right to impose’’such limitations and restrictions on his gift'as he may think, proper. In the case of a feme covert, who, -at common law, is considered as incompetent tó do any legal act of alienation, it cannot be that she would have greater powers than one, Avho is under no legal disability. But it is said, that the sale was necessary to'her support, and hence it ought to be sustained. The'Court of,Equity has no power either to make-or confirm a sale of a separate estate, which, .by the deed, creating it, is expressly prohibited from being sold. On. the facts, however, I ■ should be disposed to think (if this restriction in the deed did not exist) that the, sale could not be siistained. In such a case, the sale must ha.vé been the voluntary act of the wife, and for .such-purposes as the .Court, on examination, would have ordered to be made. In this instance it.appeárs that the wife, by the persuasions of the husband and the threats of Beck,, did sign the bill of sale. It is true the Commissioner and Chahcel- ’ lor both conclude she was under no actual constraint — by which I understand there was no legal duress. This, however, was not necessary to be'shown, to avoid ■ h'er acts. , In-law she is •always, in the presence of her husband,'supposed to act by his compulsion, and her act is, therefore, considered as his. It was for those undertaking to sustain the sale to show it to be the result of her own will. If it arose from the persuasion of the husband,-who has been pronounced by the Chancellor to be of *45 that class “ who are described as worse than an heathen,” it was his sale, and not hers; but when we add to this that the officer of the law was saying to her, “If you do not sign the bill of sale, I will levy executions on your cow and horse,” it would surely be asking a great deal to require a Court to pro-' nounce a sale so made by a feme covert to be her own voluntary act. The propriety of the sale, too, has not been made out: for all the debts, to pay which the slave was sold, were debts contracted by the husband. It is possible that they were for supplies for his family; but the credit was given to him, and not to his wife, and in such a case it would be in vain to ask an order for the sale of the wife’s separate estate from the Court of Equity. The report of ’the Commissioner is no answer to the inquiries which Chancellor Harper directed him to make. It was his business to examine as to the points submitted to him, and give the Chancellor the benefit of his judgment upon them. If his report can be regarded as deciding any thing, it must, instead of being against the complainant, be considered in her favour : 1st. In deciding that the bill of sale was executed unwillingly by her; 2d. That the proceeds of the sale were applied to the payment of debts contracted by the husband before the sale; and 3d. That a part of those debts were not necessary to the support of the complainant.
In every point of view, 1 think the sale of James J. Calhoun and wife, of the slave Jemimah, to Dixon Thompson, the defendant, cannot be sustained. It is, therefore, ordered and decreed, that the decree of Chancellor DeSaussure be reversed : that the defendant, Dixon Thompson, do delivér up the slave Jemimah, and her child or children (if any), and account for her hire to such trustee as may be appointed by the Court of Equity for Barnwell District, for the complainant, and that the said Dixon Thompson do pay the costs of this suit.
Johnson and Harper, JJ., concurred.

Decree reversed.