# Euphrasia Cooke, by prochein ami, *vs.* Joseph E. Husbands, and others.

In equity, a *married woman* is to be treated as a *feme sole*, in respect to he r *separate estate*, and where the instrument creating the estate contains *no limitation* on the power of disposition, she *may* dispose of it as a *feme sole*, upon the principle that the *jus disponendi* accompanies the property.

But where a mode of alienation, or of appointment, is provided in the instrument creating the estate, that mode *must be* pursued, for it operates as a *negation* of any *other*, and is a paramount law, governing and controlling every contract in relation to the property.

A testator devised all his real estate to trustees, in trust, to pay the *rents* and *profits* thereof to such persons and purposes as his two nieces shall, by any writing or writings, under their hands and seals, *"from time to time"* direct and appoint, notwithstanding their covertures, and in default of such appointment, to pay the same to his said nieces, free from the control, debts or engagements of their husbands, and "from and immediately after the death" of each of his said nieces, to hold her one-half of the said *rents* and *profits* to the use of her *child* or *children*, and in case of the death of either niece, without issue, during the life of the other, her share of the *rents* and *profits* to be held by the trustees, for the benefit of the survivor, and in the event of the death of both, without issue, he disposes of the whole estate upon other trusts. HELD:

1st. That the testator *designed* to limit the power of disposal to the *rents* and *profits*, and the nieces had but *life estates*, and, therefore, no power to unite with the trustees in a conveyance of *the fee*.

2nd. That they had power to appoint the rents and profits arising out of the *contingent remainders* to each, depending on the previous death of the other, such interests being *assignable* in *equity*.

3rd. That the words *"from time to time,"* imposed no restriction upon alienation or appointment, so as to prevent *anticipation*, and the nieces had power to make a *sweeping appointment* of all their interests in these *rents* and *profits*.

A devise of the interest of a fund, or the profits of an estate, as a general rule, passes the fund or estate absolutely, but this construction does not obtain where the will shows a different intent, for the testator's intention, to be gathered from the whole will, must have effect.

A deed of a married woman, conveying her separate estate, over which she had the power of appointment, even if not good at law, may, in equity, be treated and *enforced* as an agreement to assign or appoint.

Where the draughtsman was instructed to prepare a deed conveying a certain interest in property, and, by *mistake*, made it to embrace a greater interest than the parties *intended*, a court of equity will, upon parol proof of such mistake, reform the deed.

APPEAL from the Circuit Court for Baltimore city.

By his *will*, executed in 1833, William Mann devised to certain trustees *all his real estate*, in trust, for the following purposes, viz: "In trust that they, the said" trustees, "their heirs and assigns, do and shall pay one-half of the rents, issues and profits arising therefrom, unto such person or persons only, and for such intents and purposes only, as my said niece, Eurydice, by any writing or writings, under her hand and seal, *from time to time*, shall direct or appoint, notwithstanding any coverture she may be under, and in default of such direction or appointment, and in the mean time, until she shall make any such direction or appointment, do and shall pay the same, or so much whereof she shall *from time to time* happen to make no such appointment, into the proper hands of my said niece, exclusively of any husband she may happen to marry, who is not to intermeddle therewith, nor is the same, or any part thereof, to be subject or liable to such husband's control, debts or engagements; and I will and declare that the receipt of my said niece, or such person or persons as she shall or may, *from time to time*, direct or appoint to receive such rents, issues, or profits, shall, notwithstanding any such coverture, be good and effectual releases and discharges for the same, or so much thereof as shall be expressed to be received; and from and immediately after the death of my said niece, Eurydice, the said trustees to hold her share of the said rents, issues and profits to the use of all and every the child and children of the said deceased, equally to be divided between or among them, if more than one, share and share alike, and if but one child, then to the use of the said child, and his or her heirs, executors, administrators and assigns, forever; provided, also, if there be a child or children, and such of them as shall be a son or sons, shall happen to die before he or they shall attain the age of twenty-one years, and such of them as shall be a daughter or daughters, shall happen to die before she or they shall attain her or their ages of twenty-one years, or be married, then, and in such case, it is my will that my said niece, Eurydice, shall be taken to have died without issue, and her share of the rents, issues and profits shall be held by the said

trustees for the benefit of the *surviving* niece, or her issue, as is hereinafter provided. And as to the remaining half of the said rents, issues and profits, I give the same to the said trustees, in trust, that they shall pay and apply it to the use of my niece, Euphrasia, and her issue, in the same manner and to the same purposes as is hereinbefore provided and limited for the use of my niece, Eurydice, and her issue; and in case of the death of either of my said nieces, without issue, during the life of the other, then the part, share and portion of such niece so dying, to be held for the use of the *survivor* of said nieces, and her issue, under the same provisions and limitations to which the original share was liable; and in the event of the death of both of my said nieces, without issue, then I give and devise the whole of the said real estate above devised, together with the rents, issues and profits therefrom arising" to certain *other trustees*, for the uses and purposes of an infirmary for children, &c.

The two nieces subsequently married, and on the 3rd of September 1841, they, with James Edwards, who had been appointed, by a decree of Baltimore county court, their trustee, in place of the trustees named in the will, executed a deed to Joseph E. Husbands, of property held by the trustee under the will. This deed, between Edwards of the *first* part, Euphrasia Cooke and Eurydice Pennington of the *second* part, and Husbands of the *third* part, *recites* the provisions of the will, and also that "for the consideration hereinafter expressed, the parties of the *second* part have sold to the party of the *third* part hereto, all their estate and interest, right, title, use, trust, property, claim and demand whatsoever, of, in, unto and out of the several parcels of ground and premises hereinafter described, and the several rents issuing and payable thereout." It then proceeds: "Now this indenture witnesseth, that for and in consideration of" one dollar, to the party of the first part paid, by the party of the third part, "and of the sum of one thousand seven hundred dollars, lawful money, to the parties hereto of the second part also paid by the party of the third part," the receipt of which is acknowledged, "the said James Edwards, trustee as aforesaid, hath, by the *direction and ap-*

*pointment of the parties of the second part hereto*, testified by their being parties to, and signing, sealing and delivering these presents, granted, bargained and sold, aliened and conveyed, and by these presents doth, by the *direction and appointment aforesaid*, testified as aforesaid, grant, bargain and sell, alien and convey, and the said Euphrasia Cooke and Eurydice Pennington have, and each of them hath, granted, bargained and sold, aliened, enfeoffed and conveyed, and by these presents do, and each of them doth, grant, bargain and sell, alien, enfeoff and convey unto the said Joseph E. Husbands, his heirs and assigns, *all the estate and interest, right and title* of the said Euphrasia and Eurydice, of, in, unto and out of" five several pieces of ground and premises, which are particularly described in the deed, and are also recited as yielding annual rents under perpetual leases; "together with the improvements and appurtenances, and the *reversion* and *reversions*, rents, issues and profits thereof, and especially the aforesaid annual rents so as aforesaid reserved thereon, and issuing and payable thereout, and *all the estate* and *interest, right* and *title* of the *parties* hereto, of the *second part*, and *each of them*, in, unto and out of the same. To have and to hold the five several pieces or parcels of ground and premises above described, and hereby granted and conveyed, or mentioned or *meant* and *intended* so to be, with the appurtenances, unto the said Joseph E. Husbands, his heirs and assigns, *for and during the term of the natural lives of the said Euphrasia Cooke and Eurydice Pennington*, to the end and intent that the said Joseph E. Husbands may, *during the above period*, be permitted to collect and receive the five several clear, annual rents aforesaid, for his own proper use, benefit and behoof, with full right and power to said Husbands to enforce, if need be, by all lawful ways and means; the payment of said rents."

The *acknowledgment* to this deed is made in the usual form by *all the grantors*, as if *sui juris*, there being no separate examination of the *married women*. Mrs. Pennington died *without issue* in April 1848, and on the 19th of December 1848, *the bill* in this case was filed in the High Court of Chan-

cery, by Mrs. Cooke, against Husbands, the grantee in the above deed, Eber F. Cooke, her husband, and the trustee who had been appointed in place of Edwards.

The bill alleges that all that was *contracted to be sold* by the above deed, was Mrs. Pennington's interest, for life, in one-half of these rents, and complainant's own interest, for life, in the other half, and not any interest or estate to devolve under the will on the one or the other, by the death of either, and that she executed and acknowledged said deed under the impression that it was conveying only the life interests of the two, and that it would not carry, or in any wise affect, the half that would devolve on her by the death of Mrs. Pennington; that Husbands now inequitably and fraudulently pretends that the phraseology of the deed accords this latter half to him, but insisting that no reasonable interpretation of the deed can assure to him such an interest, and relying on its terms as limiting his present rights to her own half, complainant insists that however the deed may be construed, the *contract of sale* should govern his claim, and that the deed, if necessary, should be *reformed* and *modified* to conform to said *contract*, and that so far as it apparently varies therefrom, it was executed in *mistake*. The bill further charges, that the deed is invalid, because, by the terms of the will, complainants was debarred from making any conveyance, *in anticipation of accruing rents*, of her interest in said rents, and even if such a conveyance were admissible under the will, it cannot operate without the union therein of her husband, and her *separate examination*, as in ordinary assurances of a *feme covert's* estate.

The bill also charges, that the deed is inoperative as to the *consideration* which was paid in *Tide Water Canal bonds;* that the rents conveyed, amount to $275 *per annum*, and the consideration therefor, stated in the deed, is $1700, while the amount in fact paid, by disposition of the canal bonds, was but $850, they having sold at 50 cents in the dollar, instead of yielding 73 cents, agreeably to Husbands' assurances of their value, under which they were taken. It also insists that the deed was inoperative, because it was obtained by fraud and imposition, from complainant and Mrs. Pennington, for the

benefit of their husbands, and to pay their husband's debts, without any part of the money coming to the complainant, and, in this aspect of the case, the bill claims that the deed shall be vacated and the property re-conveyed, at least, on Husbands being refunded, from the rents, his actual outlay therefor, as determined by the realized value of the canal bonds. It also claims an *account* of rents received, and payment to the complainant, or for her benefit, of any balance found due upon the accounting.

The bill then prays for relief according to the several views in which the case is presented, and for an injunction restraining Husbands from collecting, and the tenants of the property from paying to him, any part of these rents, until the further order of the court, and that a receiver be appointed to collect and receive the same, and to hold, preserve and dispose of them as the court shall direct, and for general relief.

The *deed* and *will* were filed with the bill as exhibits. The chancellor (JOHNSON) granted the injunction as prayed, but ordered "the application for a receiver to stand over for the coming in of the answers."

The answer of Husbands denies that, by the death of Mrs. Pennington, any part of these rents became the property of the complainant, and charges that she parted with her *whole interest* therein by the deed. He avers, that on the day the deed was executed, he, with the two justices before whom it was acknowledged, and his counsel, went to the house of the complainant, and where her sister, Mrs. Pennington, was also living, and that the deed was read to both of them, and one-half of the purchase money, in canal bonds, was then paid to Mrs. Pennington, and the other half was counted into the hands of the complainant; that when called on, by their husbands, to purchase the interests of these ladies in these ground rents, he told them he would purchase, provided the canal bonds would be received by the owners of the property, and he denies that he ever made any representations to any of the parties, as to the value of these bonds, but, on the contrary, repeatedly told both their husbands, during the negotiations, which lasted nearly six weeks, to go into the market and ascer-

tain their value.   He also denies that any false representation was made to the complainant, or her sister, in regard to the extent of the estate conveyed by the deed, but that when the deed was read to them they were informed, that, if they signed it, they would thereby part with all their interest in the ground rents thereby conveyed.   He denies that he had any knowledge of the pecuniary condition of the husbands, or that they, or either of them, designed to, or did, apply the money paid to their respective wives, to their own use.   And this respondent further says, that the contract made on his part is clearly expressed in the deed which the complainant has filed in this court, and that said contract requires no reforming or changing, to carry out the true intent of the parties.   He further denies that the deed is in any manner defective, or that it was at all necessary for her husband to have united in executing it, or that she was in any way debarred from directing her trustee to dispose of the property, and further denies all manner of unlawful combination, fraud and confederacy wherewith he is charged by the bill.

Cooke, in his answer, says, that all is true that is stated in the bill, concerning the negotiation for, and transfer of, the interest of his wife in these rents, and states that the interest agreed by respondent (his wife not having been a party to the agreement) to be conveyed, was only the interest then actually in his wife for life, and none that might, by the death of her sister, accrue to her, and that neither his wife nor himself believed that any further, interest was conveyed, and that the representations and understanding expressed when the deed was executed, were all to that purport, positively and strictly. He also admits that the other allegations of the bill are true. The trustee, in his answer, says, he is a stranger to the matters complained of in the bill, and submits to such decree as the court may deem proper to pass.

A commission was then issued, and testimony taken, the purport of which is sufficiently stated in the opinion of this court.   The cause was then removed to the circuit court for Baltimore city, where it was argued, and the court (KREBS, J.) decided that the will gave to the nieces the power of disposi-

tion of these rents, and prescribed the *particular mode* in which they were to do it, and that, by the terms of this power so given, they were authorized to make an *absolute* or *sweeping disposition* thereof.   He also decided that the deed was a valid exercise of the power in the mode directed by the will, and that it conveyed the contingent interest which vested in the complainant upon the death of her sister, as well as the complainants own life-estate, and that there was no sufficient proof of fraud or *mistake* so as to authorize the court either to vacate or reform it.   He therefore passed a decree, dissolving the injunction and dismissing the bill, and from this the complainant appealed.

The cause was argued before Eccleston, Tuck and Bartol, J.

*Chas. F. Mayer* for the appellant:

1st.  The deed, by its actual, legal import, is to be construed as conveying only the immediate life estates of Euphrasia and Eurydice.   And no deed could, *at law*, convey more; the interest in the *cross-remainder* being contingent, the assignment of which will not, in equity, be deemed effective, unless in point of consideration, and of all circumstances connected with the rights of the wives, an equitable case, fit for specific performance of a contract, be clearly made out.   No such case is here presented in favor of Husbands.   *Comyn's Digest Titles "Assign" C. (3.) "Grant" D. Fearne on Remainders,* 289, 444.   1 *Preston on Estates,* 68, 70.   *Coke Litt.,* 46, *b.*   1 *Ves., Sen.,* 391, *Whitfield vs. Fausset. Ibid.,* 411, *Wright vs. Wright.*   10 *Coke,* 51, *Lampet's Case.*   2 *Spence's Eq.,* 855.   14 *Johns.,* 193, *M'Crackin vs. Wright.*   17 *Johns.,* 167, *Jackson vs. Vanderheyden.*   Neither estoppel nor warranty can bind a *feme covert,* and, moreover, this deed contains no warranty, and neither does a deed of a contingent interest operate by way of *estoppel.*   Nor is a deed of *bargain* and *sale* equivalent, in this State, for all purposes, to a *fine and recovery.*

2nd.  But if the deed does pass this contingent interest, then

it was executed under a *mistake*, and should be *reformed*. The testimony clearly shows that only the present life estates of the wives were *contracted* to be conveyed. The draughtsman of the deed says that his *instructions* were to convey only such life estates, and that he drew the instrument for *that purpose*, and thought, at the time, it only conveyed such interests, and would think so now, but for the doubts of counsel. There cannot be *stronger* evidence of the mistake than this. (2 *Md. Ch. Dec.*, 388, 389, *McDowell vs. Goldsmith.*) Again, the defendant himself never supposed the deed conveyed the *cross-remainders*, and in his answer to the explicit charges in the bill, as to what the *contract* was, he says the *deed speaks for itself*. Such an answer is not a *denial*, upon oath, of the *charge in the bill*; it is evasive, and not frank.

3rd. The will does not authorize any conveyance or disposition of the rents or property devised to these ladies; at least none is authorized for the cross-remainders. Where a settlement contains a limitation on the power of disposition, or prescribes the *mode* of disposition, the wife is *bound by* it, and where the settlement contains no power of disposition, she has no power to alien or dispose of the property. 1 *Ves. & Bea.*, 118, *Lee vs. Muggeridge.* 3 *Johns. Ch. Rep.*, 78, *Methodist Church vs. Jaques.* 4 *Md. Ch. Dec.*, 68, *Tarr, et al., vs. Williams & Wife.* *Ibid.*, 414, *Williams vs. Donaldson.* 2 *Wharton*, 11, *Thomas vs. Folwell.* *White's Eq. Cases* in 65 *Law Lib.*, 370 to 378, and the cases there cited in the comments upon the case of *Hulme vs. Tenant.* 8 *Gill*, 134, *Smith vs. Morgan.* 5 *Md. Rep.*, 234, *Miller & Mayhew vs. Williamson.*

4th. If any disposition be authorized, an assignment of the rents *by anticipation*, or, in other words, a *sweeping appointment* of the whole prospective interest in the rents, is not authorized. 65 *Law Lib.*, 369, 370, and cases there cited. 3 *Johns. Ch. Rep.*, 114. No particular form of words is necessary to restrain such alienation; this must depend upon the *intent* of the testator, to be gathered from the *whole will*. This intent is sufficiently manifest upon the face of this will, for the testator directs the trustees to pay the rents to such person or

persons *only*, and for such intents and purposes *only*, as his nieces, by any *writing or writings*, under their hands and seals, *from time to time* shall direct and appoint, and until she shall make any *such* appointment, to pay the same, or so much whereof they shall *from time to time happen* to make *no such* appointment; and he further provides that the property shall be *free* from the *intermeddling* of their husbands, and not liable to their control, *debts* or *engagements*.

5th. It is further insisted, that the consideration actually received, was imposed upon the parties by misrepresentation and fraud, and that the deed was procured, as the testimony shows, through the *control* and *intermeddling*, and *for the benefit of the husbands*, and is, for these reasons, void.

*John Nelson* for the appellees:

The questions presented in this case are these. 1st. Had these parties power under the will to convey at all? 2nd. Had they the power to convey the cross-remainders? 3rd. What in point of fact have they conveyed by this deed? 4th. Was there any *fraud* for which the court will *vacate* the deed? and 5th. Was there any *mistake* which will authorise the court to *reform* it?

1st. The will confers a sweeping power of appointment by *any writing or writings* under their hands and seals. There is no restriction or limitation in the words *"from time to time,"* which are supposed to limit the *appointment* to such rents and profits as may become due from time to time. The *dictum* of Chancellor Kent on this point, in the case of *The Methodist Church vs. Jaques,* was overruled, on appeal to the Court of Errors, (17 *Johns.*, 548,) where it was also held contrary to the opinion of the Chancellor, that a *feme covert*, with respect to her separate estate, is to be regarded in a court of equity as a *feme sole*, and may dispose of her property without the consent or concurrence of her trustee, *unless* she is specially *restrained* by the instrument under which she acquires her separate estate. That a limitation against the power of *anticipation*, is not made by the words *"from time to time,"* has been clearly settled by *numerous cases* in England. See 65 *Law Lib.*, 369.

2nd. As to the power to convey the cross-remainders. There is no distinction in the will between the *rents* and the *rest of the estate;* the whole goes to the *survivor,* upon the death of either without issue during the life of the other. At *common law,* you could not by a deed of *bargain and sale* convey such an interest, because you could not give *livery of seizin,* but you could do it by a *fine and recovery,* which would operate by way of *estoppel* during the life estate, and the moment the life estate fell in would become *operative* as a *conveyance* making the estate *absolute. Fearne on Remainders,* 365, 550, 551. 8 *Barn. & Cress.,* 497, *Brune vs. Martyn.* That such an interest is assignable, is conclusively settled by the case of *Miller & Mayhew vs. Williamson* 5 *Md. Rep.,* 237.

3rd. The deed actually conveys "all the *estate, interest, right* and *title, reversion* and *reversions,*" with *habendum* to the said Husbands, his heirs and assigns, "for and during the *natural lives* of the said" Euphrasia and Eurydice; that is during the life of *both,* not during their *joint lives.* It clearly passes the cross-remainders.

4th. As to *fraud.* The deed was executed on the 3rd of September 1841. The consideration was to be paid in the notes of the Tide Water Canal Company. The parties were told to inquire into the value of these notes for themselves, and they took them *without question.* They made no claim until *seven years* after the date of the deed. Such *laches* will prevent the claim from being set up now. There was no fraud in paying the purchase money into the hands of the husbands, if the wives consented to make them agents to receive it, and that they did so appoint them as agents, is conclusively shown by the evidence. See 9 *Gill,* 156, *Clements vs. Smith.* 2 *Gill,* 163, *Bell vs. Webb & Mong.* 2 *Md. Ch. Dec.,* 474, *Latrobe vs. Tiernan.* 3 *Gill,* 366, *Glenn vs. McKim.* 3 *Bland.,* 142, *Salmon vs. Clagett.*

5th. As to *mistake.* The answer denies the mistake, and says that the deed contains the *contract.* Now when a deed is sought to be reformed on the ground of mistake, the authorities all show that the proof of the mistake must be *clear, satisfactory,* and of such a character as to leave no *reasonable*

*doubt* on the mind. (6 *Ves.*, 328, *Marquis of Townshend vs. Stangroon.* 1 *Brown's Ch. Rep.*, 94, *Irnham vs. Child.* 6 *H. & J.*, 445, *Watkins vs. Stockett.* 2 *Gill*, 163, *Bell vs. Webb.* 9 *Gill*, 430, *Beard vs. Hubble.* 1 *Md. Ch. Dec.*, 239, *Goldsborough vs. Ringgold.*) And there is no evidence in this case which comes within this rule.

Tuck, J., delivered the opinion of this court.

As we understand the English cases, the doctrine was established before the American Revolution, that in equity a married woman is to be treated as a *feme sole,* in respect to her separate property; and that she may dispose of it, unless restrained by the instrument creating the estate. There is to be found some diversity among the cases since that time, and, especially, as to what amounts to restraint upon alienation. In this country the decisions have not been uniform, some following the English doctrine, and others denying to the wife any power over the subject not authorised by the deed.

For examination of these questions and the authorities, see 2 *Roper on Husband & Wife*, ch. 19, 20. 1 *Sugden on Powers*, ch. 4, sec. 1. *Hill on Trustees*, 633, (*Ed. of* 1857.) *McQueen on Husband & Wife*, 294. *Clancy on Husband & Wife*, chaps. 5, 6, 7, 8. *White & Tudor's Cases in Equity*, 324, (*Hulme vs. Tenant.*) 3 *Johns. Ch. Rep.*, 77; and same case on appeal in 17 *Johns. Rep.*, 548. *Story's Eq.*, sec. 1390. *Adam's Equity*, 44, 45.

In Maryland the law is settled, that where a mode of alienation or of appointment is provided, it operates as a negation of any other mode, and is a paramount law governing and controlling every contract in relation to it. *Lowry vs. Tiernan*, 2 *H. & G.*, 34. *Tiernan vs. Poor*, 1 *G. & J.*, 216. *Brundige vs. Poor*, 2 *G. & J.*, 1. *Miller vs. Williamson*, 5 *Md. Rep.*, 219. But it has never been decided as far as we can discover, whether a *feme covert* may or may not dispose of her separate estate, where the deed is silent on the subject. We may consider it as unsettled as late as 1849, when the Court of Appeals declined examining the question of a *feme covert's jus disponendi* of her estate, "where the instrument un-

der which she held conferred no such power in terms."
*Smith vs. Morgan*, 8 *Gill*, 139. The point was not deter-
mined in *Miller vs. Williamson*, 5 *Md. Rep.*, 219, and that case
is not to be considered as authority on this precise question, the
observations of the court having been made, with reference to
the will then under consideration. See also 5 *Md. Rep.*, 134.
The late Chancellor, in the cases of *Tarr vs. Williams* and
*Williams vs. Donaldson*, 4 *Md. Ch. Dec.*, 68 and 414, expressed
his concurrence with Chancellor Kent's views, as set forth in
the case of *The Methodist Church vs. Jaques*, 3 *Johns. Ch.
Rep.*, 77, and also with those of Chief Justice Gibson, in
*Thomas vs. Folwell*, 2 *Whart.*, 11. It must be observed, that
in these cases, the question we are now considering was not
necessary to the decision, for in each of the deeds there was a
mode of appointment prescribed, and it was sought to appoint
or alienate in a different manner. Chief Justice Spencer, in
reviewing Chancellor Kent's opinion, (17 *Johns.*, 578,) de-
clared, that "from the year 1740 to 1793, (with the single ex-
ception of the opinion of Lord Bathurst, in *Hulme vs. Tenant*,
which occurred in 1778, and in which a rehearing was
granted by Lord Thurlow, and the opinion reversed,) there
was an unbroken current of decisions, that a *feme covert*, with
respect to her separate estate, is to be regarded in equity as a
*feme sole*, and may dispose of her property without the con-
sent or concurrence of her trustee, unless especially restrained
by the instrument under which she acquires her separate es-
tate." And Chancellor Kent himself, admits the weight of
authority to be against him. Indeed, he concedes that an in-
tent may be deduced, where the deed does not speak, for in
his opinion he says: "Perhaps, we may say, that if the in-
strument be silent as to the mode of exercising the power of
appointment or disposition, it intended to leave it at large, to
the discretion and necessities of the wife, and this is the most
that can be inferred." And he very clearly places his decree
on the circumstance, that there was a mode of appointment
prescribed in the instrument, and that no other could be re-
sorted to. But if we are to take these eminent jurists, as hav-
ing declared that power does not exist unless it be conferred by

the deed, it may be said, that while there is much force in the reasoning employed by them, on the general subject, when considered with reference to the objects of such deeds, and the circumstances under which, generally, they are executed, as stated by them, very distinguished judges have held the contrary doctrine, and supported their judgments with as much ability, if it be conceded that they have based their conclusions on a correct understanding of the policy and purposes of such settlements.

We think that there is a principle underlying this branch of jurisprudence which should not be disregarded, and that is, that the right to dispose accompanies the ownership of property, which cannot be fettered by intendment, however this may be done by express words; and as these settlements are creatures of equity, designed to confer rights on married women not enjoyed at law, and may be made to express what the parties intend, the *feme covert* should be considered as having the power of disposal, unless a different intent be manifested by the instrument. It cannot be maintained as a general proposition, universally true, "that these settlements are intended to protect the wife's weakness against her husband's power, and her maintenance against his dissipation," as assumed in 3 *Johns. Ch. Rep.*, 113, for many of them are made where the utmost confidence is reposed in the husband; the sole object being to protect the wife and family against the consequence of his misfortune or losses in business, by exempting the property from liability for his present as well as future debts. We are not to assume, that husbands will be constantly endeavoring to wrest their wives' property from them, and devote it to their own uses. It is more reasonable to suppose, that they will guard and protect her rights, and act in reference to her separate estate, for the interest of all concerned in the trust. That cases of hardship and wrong have occurred there can be no doubt, but, in a large majority, we think the purposes of the settlements have been faithfully fulfilled, by leaving to the wife the control of the property, under the advice of the trustee and her friends; nay, indeed, of the husband himself. It is not a conclusion of law, that when prop-

Cooke vs. Husbands, et al.

erty is settled on a married woman or on a *feme sole* in contemplation of marriage, the settler designs she shall never dispose of it.   It may happen, that her interest will be promoted by a change of investment, and this is often provided for. We incline to the opinion, that in most of the instances in which the English doctrine has been departed from, the judgments were pronounced under circumstances of extreme hardship, bending the law to meet emergencies and prevent consequences not apprehended, and therefore not provided against at the creation of the trusts.   In answer to many of the considerations urged against this view of the law, it may be said, that if the parties making the settlement intend to tie up the property in the wife's hands, they may use apt and proper limitations, and that where they have not done so, it must be supposed they intended to leave it at large, to the discretion and necessities of the wife, as a *feme sole,* acting under the advice of those on whom she may rely.   Therefore, following the decisions, which, under our institutions it is the duty of this court to respect as authority, we are of opinion, that a *feme covert* may act in reference to her separate estate as a *feme sole,* where the settlement contains no limitations on the subject, on the principle that the *jus disponendi* accompanies the property, unless restrained in terms, or by the manifest intention of the instrument.

Upon considering the will before us, and collating its several parts, we are of opinion that the testator designed to limit the power of disposal to the rents and profits arising from the property devised to the trustees, and that his two nieces had no authority to unite in a conveyance of the fee by the trustee, even conceding that, as to them, the forms prescribed by the act of 1830, ch. 164, were not necessary; upon which we express no opinion.   It has been decided, that if the interest of a fund or the profits of an estate be given by will, the devisee will take the fund or estate absolutely.   This is generally the construction, but it does not obtain where the will shows a different intent, for the testator's intention, to be gathered from the whole will, must have effect. *Cassilly vs. Meyer,* 4 *Md. Rep.,* 1. *Magruder vs. Peter,* 4 *G. & J.,* 323.   In the present case,

only the rents and profits are given to these nieces, with limitations over; and upon the happening of contingencies set out in the will, the estate is disposed of by another declaration of trust, upon the supposition, that a time would arrive when neither the nieces nor their descendants could enjoy the rents and profits. If the rents had been in terms limited to them for life, the point would have been clear of difficulty, on the authority of *Lowry vs. Tiernan*, 2 *H. & G.*, 34, and numerous other decisions. The result must be the same, if that intent can be collected from the will. It declares what the trustees are to do with the rents, "from and immediately after the death" of the nieces, not adding, in case they shall not have appointed or disposed of the rents in their lifetime, or equivalent words, but showing that the fee was to remain in the trustees, to gratify other purposes declared by the testator, which looked beyond a failure of issue of both nieces. In the case of *Lowry vs. Tiernan*, the court remarked upon the circumstance, that no power had been reserved to the wife over the principal, except by last will and testament, and then only in a certain event. Here no power over the estate is given at all, either absolutely or conditionally; the power relates to the rents and profits only. It was also said in that case, that rights were reserved to future children who would take as purchasers, and that these contingent rights must be protected. The same is the case here, and regard being had to the general intent of the will, we think the same construction should be applied. If we were to hold, that the nieces could make sweeping appointments, to operate beyond their own lives; so as to defeat the expectations of others, we should be setting up for this testator a will that he did not make for himself. *Wilson vs. Farquharson*, 5 *Md. Rep.*, 134.

We are also of opinion that they had power to appoint the rents and profits arising out of the contingent remainders to each, depending on the previous death of the other, as that acquired by Mrs. Cook, by the death of Mrs. Pennington without issue. In *Fearne on Remainders, (by Smith, Ed. of 1845,) Vol.*, 2, 436, it is said, that "executory interests in persons in being and ascertained are assignable in equity, for a

valuable consideration, and even for good consideration, ex-
cept as against *bona fide* creditors;" and that by this it is
meant, "that an assignment of them is treated in equity as a
contract or agreement, of which it will decree a specific per-
formance." *Wright vs. Wright*, 1 *Ves. Sen.*, 409.   2 *Peere
Wms.*, 182, 187, 191.   But on this point it is enough to say,
that in *Miller vs. Williamson*, 5 *Md. Rep.*, 219, it was decided,
that a contingent interest depending on the death of another,
was assignable, and relief was granted accordingly, which
settled the doctrine in this State.   Whether such an interest
of a *feme covert* can pass at common law, except in the mode
provided by our acts of Assembly, for transferring the estates
of married woman, we need not decide; because this proceed-
ing is in a court of equity, where a *feme covert* is allowed to
deal with her separate property, and if this deed is not good at
law, it may be treated and enforced as an agreement to assign
or appoint.   *Tiernan vs. Poor*, 1 *G. & J.*, 216.    And inas-
much as Mrs. Cook is asking relief against the operation of
this instrument, on the ground that she had not power so to
dispose of the rents, she must, if she succeeds to any extent,
submit to be bound by her agreement, as far as under the will
she had power to appoint.

But it is said, on the part of the appellants, that this will
contains a restraint upon alienation or appointments, except of
the rents as they might accrue and fall due, by force of the
words "from time to time."   Lord Thurlow thought that the
meaning of these words was to limit the appointment and
prevent anticipation, and he hesitated before deciding other-
wise; but, finally, yielded to what he considered the necessary
deduction from previous decisions.   It is a remarkable fact
that they were introduced by the master in chancery, in the
settlement of a married woman's property, made under direc-
tion of the court, for the very purpose of preventing a sweep-
ing appointment, and when their effect upon an appointment
afterwards came before the same court, the Chancellor held
that the words were not sufficient.   *Pybus vs. Smith*, 1 *Ves.
Jr.*, 189.   3 *Brown's Ch. Rep.*, 339.   Speaking of this case, Lord
Eldon, in *Jones vs. Harris*, 9 *Ves.*, 493, said:   "The court

settling the property, in order to protect it, with all the anxious terms then known to conveyancers, in a day or two afterwards, while the wax was yet warm upon the deed, the creditors of the husband got a claim upon it, by an informal instrument, and the same judge who had made such efforts to protect her, was, upon authority, obliged to withdraw that protection." Yet this construction has ever since been applied there to settlements containing this expression. What effect they shall have in Maryland, is a very important question, when we consider the time elapsed since the cases in which they received a judicial construction, that numerous settlements are drawn after the same form, substantially, and that much property may now be held, under like instruments, in reliance upon what was supposed to be the established doctrine. Under such circumstances we deem it unsafe to disturb the interpretation they have received. And we feel less hesitation in thus deciding in the present case, because the party now seeking to escape from the accepted construction, is herself a party to the deed, by which the power of appointment was exercised, and evidently supposed at that time, that she could pass the rents and profits by anticipation.

With these impressions of the will we should decide with the court below, but for the questions of fact presented by the record. We are of opinion that the appellants did not make out a case of fraud on the part of Husbands, in obtaining the property from Mrs. Cooke and Mrs. Pennington, but the case shows, as we think, that the deed was executed under a mistake, or rather that it conveyed more than the parties intended. In the first place it is to be observed, that the defendant does not fully and frankly answer the bill in this aspect of the complaint; he refers to the deed as containing the contract, instead of answering the charge of mistake in direct terms. *Hamilton vs. Whitridge*, 11 *Md. Rep.*, 144. Besides, in his conversation with the witness Bridge, about the rents due after Mrs. Pennington's death, when Bridge said, he thought Mrs. Cooke could sell nothing that she did not hold, the defendant replied, "that that had been his own opinion, but that he now thought otherwise; and then went on to state the express words of the

deed, and to show how the words of the deed gave it to him," and in a subsequent part of the examination he states, "that his lawyer said he could keep it after Mrs. P's death; that his own opinion had been to the contrary once, but that his lawyer had given him to understand, that by the words of the deed, he could keep Mrs. P's one-half of the Harrison street property after Mrs. P's death, and during the life of Mrs. Cooke." We consider this a clear intimation on the part of Husbands, that his own opinion of his right to the rents was founded on the original contract, as understood by the parties, until he received professional instruction as to the operation of the deed, and that his subsequent claim was based on the deed, as giving more than he could rightfully recover under the agreement of purchase. In addition to this, the draughtsman proves the mistake in plain terms. He says: "Witness certainly received instructions as to the interest intended to be conveyed by the deed, and it was intended to convey thereby the interest which each actually had at the time, and not what either might acquire by the death of the other. Witness thought that the deed only conveyed that interest, and would think so now but for the doubts of counsel." Now, what other construction can this language receive than this, that he was instructed to prepare a deed, conveying a certain interest in the property, and, by mistake, made it to embrace a greater interest than the parties intended? It is of no consequence, that he does not state clearly from whom he received his directions. He says, however, that Mrs. Cooke never called on him about the deed, nor did he see her before it was executed. It appears from his testimony, that Pennington first spoke to him about drawing the deed, and that Husbands saw him several times afterwards, before it was prepared. The inference is clear, that he received instructions from one or both of them, and this is established by the evidence of Lovegrove, who states, that Spurrier received instructions from Pennington and Husbands. As Spurrier states what the instructions were, Husbands had a very good reason for saying to Bridge, that he once thought the deed did not convey the interest in remainder, because he was privy to the whole transaction, in-

Cooke *vs.* Husbands, *et al.*

cluding the directions by which the deed was prepared, and, according to Spurrier's testimony, must have known that it was not designed to transfer the contingent interests. The rules governing cases of this kind are very stringent, and we are not disposed to relax them, but this is not like the cases in the Court of Appeals, in which the doctrine relied upon in argument was announced. In *Wesley vs. Thomas* and *Watkins vs. Stockett*, 6 *H. & J.*, 24, and 435 it was shown as to one case, that the deed was in the form in which the parties intended and directed it should be drawn, and, as to the other, the contrary did not appear; but in the former case, the court stated the grounds on which questions of this kind must turn; that there were numerous instances where parol proof was admitted to correct mistakes in written agreements; and that mistakes and misapprehensions of the drawers of deeds, are as much a head of relief as fraud and imposition. Whatever courts may have held, as to the nature or character of proof necessary to correct mistakes in deeds, we suppose none can be more forcible than the testimony of the draughtsman himself, that he had not drawn the instrument according to the instructions he received, when considered in connection with, what we consider, the admission of Husbands to Bridge, that the deed covered a larger interest than the parties intended to transfer. If a mistake in law be committed, that is, if a deed be prepared, according to the directions of the parties, in a particular form, with the impression and design that it shall serve a purpose which the law does not allow, the case is to be determined on a different principle. Such were the cases of *Anderson vs. Tydings*, 8 *Md. Rep.*, 427, and *Campbell vs. Lowe*, 9 *Md. Rep.*, 500.

The decree will be reversed and the cause remanded, in order that the deed may be reformed, and the case disposed of according to the views of the contract herein expressed; in which adjustment an account should be taken in respect to the rents received, on account of Mrs. Pennington's interest under the will, since her death; that the same may be paid to Mrs. Cooke, or invested for her separate use.

*Reversed and remanded with costs.*