Perkins *v.* Elliott.

Contra—None.

Perkins and others, appellants, and Elliott and wife, respondents.

1. A married woman cannot charge her separate estate by a contract of suretyship, unless in consideration of a benefit to herself or her estate.

2. The rule is the same, whether such separate estate has been created by deed or will, or by force of the statute relating to the property of married women.

3. A married woman executed a joint and several note with her husband, stating therein that the money was to be a charge on her separate estate, and it appeared that this money was to be applied to the payment of a mortgage given by the husband and the wife on the lands of the husband. *Held,* that the feme was bound, as she derived a benefit from the transaction, in relieving the lands in which she had a dower right from the encumbrance.

The opinion of the Chancellor is reported in 7 *C. E. Green* 127.

*Mr. Pitney,* for appellants.

*Mr. Vanatta,* for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

The bill in this case alleges that the female defendant, Louisa Elliott, is seized and possessed of certain real and personal estate for her separate use, by force of the statute of this state for the better securing the property of married women, and that having such property she, in conjunction with her husband, made a joint and several promissory note, containing an express provision that it should be a charge upon the separate estate of the feme. The purpose of this action is to enforce this provision, and charge the money due upon this note upon the separate estate of the wife. This the Chancellor refused to do, holding that a married woman invested with the property and interest created by the act just referred to, could not, by her simple contract in writing, bind herself as surety for another so that a court of equity would enforce such obligation against her, even though the intention to bind her separate estate was clear, and was expressed in the instrument executed by her. The precise point of this decision is new to the jurisprudence of this state, and is a question of considerable moment. My researches into the subject have been attended with more than ordinary interest, and I have examined the numerous decisions with attention and care, and my conclusion is, contrary to my preconceived opinion, that the state of the law is such that this court is at liberty to deal with the question at issue as one which is entirely undecided in our courts, and concerning which no peremptory authority exists. My examination has satisfied me that this entire subject, with respect to the power of the feme covert over her separate estate, has been the creation of the court of equity, and that the system has been, from time to time, circumscribed or extended, not under the coercion of any inflexible rules or established principles, but in accordance with judicial opinion founded on very general considerations as to the propriety or policy of the particular circumscription or expansion. No one who has the least acquaintance with the topic can doubt that the

rule that a feme can bind her separate estate by a contract of suretyship, and this too in the absence of any expressed intent so to do, is, and has been for a long time past, entirely settled in the English courts. But still the doctrine, in its established form, is not sufficiently ancient to have in this court an imperative force, and the consequence is, as I have already remarked, the way is open for us to adopt a rule which will embrace, or one which will exclude, the power which has been exercised in the present instance. Any extended review or criticism of the line of cases which belong to this branch of the law would, as it seems to me, answer no rational purpose on this occasion. A very full collection of them is to be found in 1 *White & Tudor's Leading Cases in Equity, p.* 394. The only reference that I shall make to these decisions will be such brief notice as is necessary to justify the conclusion just expressed, that the rules which in the English courts regulate the subject, owe their origin not to the ancient institutes of the law, but to the judgment of successive Chancellors, influenced by reasons which do not imperatively demand implicit assent.

Looking back to the beginning of this system, we find that the separate estate itself of the feme covert is a pure creature of equity. It bears no analogy to anything existing in the common law. According to the general legal doctrine, the effect of marriage was to merge the existence of the wife into the legal life of the husband, so that with respect to property and civil rights, she, as a separate person, had no recognition. In open derogation of this cardinal principle, equity chose to invest her with a capacity to hold property in her individual right. It is certainly not to be wondered at that an estate thus originating in this clear violation of the laws of property as between husband and wife, should have been afterwards modified to suit the supposed convenience or exigency of the case.

Nor did equity scruple to introduce another anomaly when the occasion seemed to require it. It having been settled that the wife might enjoy a separate estate, the result was, as

the laws of property attached to it, that she could alienate it, and this power in its application to settlements, proving disadvantageous, the defect was remedied by another violation of legal rules, and a restraint against alienation inconsistent with the nature of the estate granted, was supported. The structure raised on a foundation thus arbitrarily laid, could of necessity have no other form than that which would proceed from the will of the builders. And such in truth was the result.

The married woman being thus recognized as the owner of the estate, the question arose as to the nature and extent of her authority over it. It became obvious at once, that in order to enjoy the privilege thus granted she must be allowed to make contracts with respect to her separate interests, and it was accordingly soon intimated in *Grigby* v. *Cox*, 1 *Ves., sen.*, 517, and in *Peacock* v. *Monk*, 2 *Ves., sen.*, 190, that to this extent she would be regarded in equity as a feme sole. The result was that those contracts which a woman under coverture made touching her separate property, although void at law, were universally enforced in equity, the principle at first being that such contracts, operating on the property, were in the nature of the execution of a power of appointment. But it was soon supposed that this principle was not broad enough to satisfy the purposes to be subserved, and accordingly in the great case of *Hulme* v. *Tenant*, 1 *Bro. C. C.* 16, Lord Thurlow decided that a bond of a feme covert, jointly with her husband, would bind her separate property. His language is: " I have no doubt about this principle, that if a court of equity says a feme covert may have a separate estate, the court will bind her to the whole extent as to making that estate liable to her own engagements, as, for instance, for the payment of debts, &c." This case does not appear to have been entirely satisfactory to Lord Eldon, but he never judicially departed from it, and it has been followed in many subsequent cases, and according to Lord Cottenham, it contains the correct view of the principle upon which

equity acts in giving effect to the agreements of married women. *Owens* v. *Dickenson,* 1 *Cr. & Ph.* 54.

This principle, that the general engagements of a feme covert will be effectuated by the method of the court acting on her separate property, has in a long series of cases been applied and put in force. Thus it has been held that she can render her estate liable in the form of an acceptance of a promissory note, or her own note, or on an engagement to pay an additional rent for a house, or on her promise to pay the costs and proceedings of a suit in chancery.

I think it thus appears that this equitable plan of pro-. ceeding with regard to the powers of a married woman over her separate estate, has sprung up by degrees, and has been gradually unfolded, and an examination of the cases will show that each successive development has been marked by doubts and contestation. During the period of its progress, eminent jurists have entertained and expressed from the bench contradictory opinions, not only with respect to the grounds of decision, but concerning the judgment to be pronounced on important branches of the system.

And although the theory of the English courts on this subject has, after an agitation of a century, settled into form and coherence, the process by which this result has been produced has not escaped the criticism of some of the most distinguished of American lawyers. Chancellor Kent, in the case of the *Methodist Church* v. *Jaques,* 3 *Johns. Ch.* 77, uses this language: "It is difficult to perceive upon what reasoning or doctrine the bond or parol promises of a feme-covert could for a moment be deemed valid. She is incapable of contracting according to the 'common right' mentioned by Lord Macclesfield; and if investing her with separate property gives her the capacity of a feme sole, it is only when she is directly dealing with that very property. The cases do not pretend to give her any of the rights of a feme sole in any other view, or for any other purpose." A similar stricture is pronounced by Judge Story in his work on Equity Jurisprudence. Nor have the English principles on

this subject been received, in their integrity, by many of the courts in this country, and perhaps it is not too much to say that the law regulating the dominion of femes covert over their own property, as it at present exists, is not identical in any two of the United States.

The decisions of our own courts, so far as they extend, are for the most part in harmony with the English precedents; but in the initial case in this state, the subject was characterized as "one of the most vexed and embarrassing questions raised in the Court of Chancery." The judicial course in this state on this subject is so well known that it is quite unnecessary to attempt to trace it here; it is enough to remark that, in *Leaycroft* v. *Hedden*, 3 *Green's Ch.* 547, the Chancellor, in adopting the rule that a feme covert is a feme sole as to her separate estate, so far as to dispose of it in any way not inconsistent with the terms of the instrument under which she holds, expressly states that he takes this course, not on the ground of any clear precedent, but because such course appears to him to be equitable, the conflict of opinion in the decisions being such as to leave him to the exercise of his own judgment.

I have thus briefly treated the commencement and gradual development of this doctrine, and have endeavored to show that it has been created and fashioned into its present form by courts of equity; that the work, at every step, has been attended with difficulty; that each new application of its cardinal principles presented a vexed question; that judicial opinions, in many important particulars, have been vague and often times discordant, and that the English system, thus formed, has not been received, without many qualifications, by the courts of this country. In this review, the object has been to justify the position taken at the commencement of this opinion, that on this occasion we are not bound by precedents, but are altogether free to adopt such a rule as we may deem, on principles of equity, the true one to the facts of the case.

The proposition is this: Shall a court of equity enforce

against the separate property of a married woman a contract of suretyship made by her, from moral considerations ? It seems to me, that for this court to execute such an agreement would be to apply the principle that a feme covert is to be regarded in equity as discovert with respect to her separate estate, and with respect to contracts relating to it, with an unwise latitude. The concession to a feme of a capacity to hold a separate estate, in an absolute form, necessarily carries with it all the powers which are requisite to the enjoyment and disposition of such property. As owner, she can sell it, or encumber it, or transfer it even as a gift. Considering her as the separate proprietor, these capacities are comprehended among the qualities of the estate, with the title to which she is ¦invested. So it may also be forcibly insisted that the general engagements will be charged by equity against her property, the argument being that when she contracts a debt she makes use of her separate property, and, as it were, converts it by anticipation, pro tanto, into money. A feme covert, who borrows money, necessarily does so as the owner of a separate estate, for she can bind herself in no other capacity ; the inference, therefore, from such act, certainly is not forced or far-fetched, that her intention was to charge her property. I can, therefore, readily comprehend how the English doctrine has grown up, that all the debts incurred by a married woman for her own benefit, or for the benefit of her estate, should be imposed on her individual property, on the ground of a manifest design to create such an encumbrance, and because it is one of the modes of enjoying property, to incur debts on the credit of it. But, when we proceed a step farther, and come to an agreement to stand as the surety of another, I confess I lose sight of the principle on which the general system should rest. Such obligations have nothing to do with the separate estate of the feme. The right to create them is a personal right, unconnected with the ownership of goods or lands, and not embraced in the fullest exercise of the *jus disponendi.* Such obligations are not, in any sense, necessary, or even convenient, to the enjoyment of

her property by the married woman. The true doctrine seems to me this : That to the extent that the feme does any act which enables her to use or enjoy her separate estate, the principles of equity will validate such act, but beyond this limit she is not discovert, and cannot bind herself or her possessions.

Nor do I think that the principle which would remove from the present case, and from analogous cases, the disability of the married state, would be a wise or politic regulation. Few women have, or are likely to have, business habits or training. From their habits in life they are necessarily exposed to imposition. They must rely mainly upon others with respect to the legal effect of their acts. To give to such an inexperienced body of persons the right to endorse notes, to accept bills, and to become surety on bonds and other instruments, under the urgency of their husbands, or from the importunities of their relatives or friends, would not be a boon, but a calamity. In my opinion there is nothing in the general doctrines appertaining to the subject, that should compel this court to concede the existence of the power in question, nor is there any consideration of public policy which seems persuasive of such a concession. I agree, therefore, with the Chancellor, as to the general principle, that a court of equity will not effectuate the contract of a married woman, not founded on a valuable consideration, binding her as surety for another.

I have reached this conclusion without drawing any of my reasons from the provisions of the statute of this state for the better securing the property of married women. The entire effect of that act is, according to my construction, to create in favor of the married woman that kind of estate which would result if these same statutory words were inserted in a deed or a will. The words here used are technical, having long been in use, and their meaning and legal effect have been, in most respects, fully established. They should have the same force whether found in a private instrument or in a public statute. There is nothing in the context of

this act to modifiy their usual and recognized signification. The purpose of the law is entirely effectuated by putting in the wife that title to her property which is so well known to equity under the designation of her separate estate. It would certainly seem to be greatly incongruous to have two rules of construction appertaining to the same language, the one to be applied to estates limited by settlement, and the other to estates arising, by force of the same terms, under the statutory provision.

But, although my examination of this subject has led me, with respect to the general principle involved, to the same conclusion as that reached by the Chancellor, I find an ingredient in the case which has a controlling effect, and which appears to have escaped attention.

There are facts stated in this bill, and which, consequently, are admitted by this demurrer, which show that the female defendant had a personal interest in raising the money for which this note was given. The circumstances thus shown are these: That one Edwin Post, the payee of the note in question, held a mortgage against *both these defendants, husband and wife,* on certain lands of the husband; that the money secured by this mortgage was the sum of $10,000, and that this note was given to the mortgagee in part payment of the encumbrance, and in consideration of its assignment to one Pardee. The language of the bill in regard to these particulars is not as full or clear as it should be, but by a rational construction of it, the facts which I have stated sufficiently appear. The case, then, is this: A mortgage on the lands of the husband, is held against husband and wife, and they unite in giving a note to raise money to pay off, in part, such encumbrance. Now, I think it is clear that in such a transaction a consideration moves to the wife, for she has a valuable, though contingent, interest in the property of her husband, which interest is encumbered by this mortgage, and the money borrowed was to be applied so as, in some degree, to exonerate such interest. In testing the wife's right to act as a feme sole, the only question is whether she is

to derive any benefit from the transaction, for if such benefit is to accrue, her right to bind herself is unquestionable. In the absence of fraud or imposition, this court cannot attempt to measure the adequacy of the interest which has induced her action. Whenever her property or rights are involved she has a competency to contract, and consequently must decide for herself as to the value of that which she will acquire by an outlay of her money, or as an equivalent for her engagements. The rule, of necessity, must be universal, that in all cases where the act of the feme ensues directly to her own benefit, and she, expressly or by implication, binds her estate, a court of equity will enforce such obligation. In the present case, as the act of Mrs. Elliott was beneficial to herself as well as her husband, it is not in her power to repudiate it. She does not stand here as a mere surety, but as a party having a purpose to subserve by entering into the contract in dispute. It is impossible to conjecture how far her own interest may have been the motive to her conduct, but it is enough to know that the effect of her contract was of possible benefit to her. As then the act of the married woman in giving the obligation sued on, was founded on some consideration valuable to herself, I can perceive no reason why the manifest justice of this case cannot be reached by the enforcement of this contract.

On this latter ground I shall vote to reverse this decree, and to give to the complainant the relief prayed for.

For reversal—Beasley, C. J., Bedle, Clement, Dalrimple, Depue, Lathrop, Ogden, Scudder, Wales, Woodhull. 10.

For affirmance—None.